520 So.2d 1 (1988)
Johnny ROBINSON, Appellant,
v.
STATE of Florida, Appellee.
No. 68971.
Supreme Court of Florida.
January 28, 1988.
*2 James B. Gibson, Public Defender and Christopher S. Quarles, Asst. Public Defender, Seventh Judicial Circuit, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Belle B. Turner, Asst. Atty. Gen., Daytona Beach, for appellee.
BARKETT, Justice.
Johnny Robinson appeals his conviction for first-degree murder and sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. Finding no reversible error in appellant's conviction, we affirm the conviction. However, we reverse the sentence of death because of improper and prejudicial argument and testimony during the penalty phase and remand for a new sentencing hearing before a jury.
On August 12, 1985, the body of Beverly St. George was found in Pellicer Creek Cemetery in St. Johns County, Florida. An autopsy revealed that she had died early that morning as a result of two gunshot wounds, one to the forehead and one to the left cheek. The medical examiner testified that the wound to the forehead was caused by discharge of a gun that was six inches to two feet away from the skin; the other wound was caused by a gun in contact with the cheek when fired. The sequence of the wounds could not be determined. The medical examiner testified, however, that either shot would have killed her virtually instantly.
Johnny Robinson and Clinton Bernard Fields, a juvenile, were arrested for the murder on August 17. Upon arrest, Robinson waived his rights and gave a sworn statement to the police. According to his statement, Robinson and Fields left a party around 11:30 p.m. on the evening of August 11, 1985, and headed towards Orlando to visit Robinson's girl friend. On the way, they saw a car pulled off on the side of the road and stopped to help. The woman told them that she was tired and had stopped to rest. Robinson claimed that when the woman noticed that Robinson had a gun, she wished aloud that she had something similar so she could kill her ex-husband. She agreed to go with the two men in their car to Pellicer Cemetery. Once there, Robinson and Ms. St. George engaged in consensual sex on the hood of his car. During this activity, Robinson took the gun out of his pants and placed it on the hood. Afterwards, according to Robinson's statement, a scuffle ensued during which the gun went off accidentally, hitting Ms. St. George in the face. He said when he realized what had happened, he shot her again out of fear that no one would believe a black man had accidentally shot a white woman.
Fields testified against Robinson at trial and told a different story. According to Fields' testimony, when they stopped at the car on the side of the road, Robinson ordered Ms. St. George at gunpoint into the backseat of Robinson's car where he handcuffed her. Robinson ordered Fields to go through her purse but he refused. At Pellicer Creek Cemetery, Robinson raped Ms. St. George and then ordered Fields to do likewise. Fields further testified that after the sexual activity, Robinson expressed fear that the woman could identify him and his car and said that the only way she could not make an identification was if she were dead. Robinson then walked up to the victim and put the gun to her cheek. Fields turned his head, heard a shot, and later saw the woman on the ground. Robinson then shot her a second time. They drove to a desolate area where Robinson took the money from the woman's purse and then burned the rest of her property.
At the penalty phase, the state introduced evidence that Robinson was convicted of rape in Maryland in 1979, sentenced to ten years in prison, and was out on parole at the time of this incident. The defense presented Dr. Harry Krop, a clinical psychologist, who testified to six nonstatutory mitigating circumstances: that Robinson was severely intoxicated, resulting in impaired judgment; that Robinson was severely emotionally deprived because he had never known his mother; that he *3 had been physically abused by the man (not his biological father) who had raised him; that he had been sexually abused by an uncle, resulting in a psychosexual disorder; and that he had suffered emotional trauma as a result of being incarcerated in an adult prison at the age of 13. Krop was of the opinion that Robinson, who frequently made extra money as a mechanic, originally stopped his car to help Ms. St. George. He was convinced that the subsequent sexual involvement and violence occurred as a result of poor judgment. At sentencing, additional testimony was presented from a guard at the St. Johns County Jail that Robinson was an outstanding inmate and was responsible on four occasions for quelling possible disturbances at the jail.
Appellant was found guilty of first-degree murder, kidnapping, armed robbery, and sexual battery. The jury, by a vote of 9 to 3, recommended death for the murder and the trial court, finding seven aggravating circumstances and one mitigating circumstance, sentenced Robinson to death.

Guilt Phase
Appellant argues that his conviction should be reversed because the trial court erred in: (1) conducting portions of the trial without appellant's presence, (2) denying appellant's motion for mistrial after evidence of a collateral crime was admitted in violation of a pretrial ruling, (3) refusing to give a requested instruction on the affirmative defense of voluntary intoxication, and (4) chastising defense counsel during closing argument in the presence of the jury. After reviewing the record, we find no reversible error.
Appellant was absent on two brief occasions during the trial. The first occasion was during the general qualification of the venire.[1] The trial judge presiding over Robinson's trial was qualifying the jury panel from which prospective jurors for the instant trial as well as for another trial would be chosen. Prior to qualifying the jurors, the following colloquy occurred:
Now, we're going to have you sworn, first of all, and Mr. Clerk, if you would swear the jurors touching upon their qualifications to serve as jurors in this Court.
(Thereupon, the prospective jury panel was sworn by the clerk.)
.....
THE COURT: Do you want your client in here during the general qualifications?
MR. PEARL: No, sir.
Thereafter, the trial court made the brief statutory inquiry required by sections 40.01 and 40.013(1) & (2), dispatched half of the venire to another courtroom for another trial, and called for the defendant:
THE COURT: Were you able to get the clothes for the Defendant?
MR. PEARL: I have a suit in my car.
THE COURT: Go talk to him, because he's in the hall and they want to find out whether he wants to wear the suit.
MR. PEARL: Yes, sir, he does.
THE COURT: You don't want him to wear it today?
MR. PEARL: I brought him a jacket for today.
THE COURT: I wanted to make sure.
MR. PEARL: And I plan, when we break up today, that I would carry the suit on down to the jail, or it can be sent.
THE COURT: Go on back down  go on in there with Otis and make sure he gets his coat, so we can start.
MR. PEARL: They have it there.
THE COURT: Go get the Defendant. (Thereupon, the following proceedings were had in open court.)
THE COURT: All right. Ladies and gentlemen, the case set for trial on this date is the State of Florida vs. Johnny Leartice Robinson, Case 85-1299-CF. Is the State of Florida ready for trial?
MR. ALEXANDER: Yes, sir, we are.

*4 THE COURT: Is the Defense ready for trial?
MR. PEARL: Yes, Your Honor, we are.
THE COURT: Mr. Clerk, swear the prospective jurors collectively to answer truthfully all questions put to them regarding their competency to serve as jurors in this cause.
(Thereupon, the prospective jury panel was sworn by the clerk.)
Clearly, the defendant was present from the beginning of his trial. We do not reach the question of whether appellant validly waived his presence during the prior general qualification process because we do not find that process to be a critical stage of the proceedings requiring the defendant's presence. We see no reason why fundamental fairness might be thwarted by defendant's absence during this routine procedure. Thus, we find no merit to appellant's contention regarding this absence.
Appellant's second absence from the courtroom occurred during the penalty phase when Dr. Harry Krop testified about Robinson's childhood and psychosexual history which included incestuous homosexual experiences. This testimony was embarrassing to Robinson, and through counsel, he asked to be excused from the courtroom. Robinson concedes that the record reflects that he consulted with his attorney and had actual knowledge of trial counsel's waiver. The record also reveals that the court took great care to assure Robinson that he could return at any time. Clearly, appellant knowingly and voluntarily waived his presence at this stage of the proceedings, and thus we find no error. See Amazon v. State, 487 So.2d 8, 11 (Fla.), cert. denied, ___ U.S. ___, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986).
Robinson's second claim involves an alleged violation of the trial court's in limine order suppressing testimony concerning a prior burglary. One week before Beverly St. George's murder, the weapon used to kill her was stolen in a burglary. The state had substantial evidence indicating that Robinson was the burglar, and thus had the murder weapon. To avoid the introduction of evidence of the prior burglary, the defense stipulated with the state that Robinson had fired the fatal shots. As a result of the stipulation, the state acquiesced in appellant's motion in limine. During the state's attempt to introduce a photograph of a weapon similar to the murder weapon, the following occurred:
MR. ALEXANDER (prosecutor): I'm going to show you what's been previously marked as State's Exhibit C for identification and tell me if you recognize that item.
DETECTIVE WEST: This is a photograph of a .22 caliber pistol.
MR. ALEXANDER: What type of pistol?
DETECTIVE WEST: That is a  referred to as a bull barreled Ruger. It's a target pistol.
MR. ALEXANDER: Are you familiar with the type of weapon that was used to kill Mrs. St. George?
DETECTIVE WEST: Yes, sir. We believe it was a .22 caliber bull barrel.
MR. ALEXANDER: Exactly like this one, right?
DETECTIVE WEST: Yes, sir.
MR. ALEXANDER: Did you ever find the exact murder weapon?
DETECTIVE WEST: No, sir, we never did.
MR. ALEXANDER: Your Honor, the State would offer this into evidence as the next respective exhibit.
MR. PEARL (defense counsel): Objection. The witness says that this is not the weapon. It is merely representative of its type. For example, Detective West, you don't know whether the weapon was exactly like this or a different length barrel, do you?
DETECTIVE WEST: The weapon  it's reported on the stolen list, the burglary list, yes, sir, and we have a description of the weapon and I can give you a serial number.
MR. PEARL: Your Honor, I didn't invite that.
THE COURT: Yes, you did. I'll give you an opportunity, at the appropriate *5 time, to do whatever you need to do to keep the record straight. If ever anything was invited, Mr. Pearl, that was invited.
Appellant later renewed his objection and moved for a mistrial. The trial court, in denying the motion, expressed its belief that West's reference to the burglary had gone "right over the jury's head," had been invited by defense counsel, and was harmless.
Appellant now argues that because of the tremendous concession defense counsel made to exclude any reference to the burglary, the objectionable testimony was extremely prejudicial and resulted in a denial of his right to a fair trial.
Appellant's argument on this point assumes that West's statement was improperly admitted into evidence. However, at worst, the admission of evidence of the burglary that netted the murder weapon violated the court's order to refrain from mentioning it. Appellant concedes that without the stipulation, evidence of the burglary would be admissible. Having considered the nature and context of the comment, appellant's stipulation, and the totality of the evidence, we must agree with the trial judge that the detective's inadvertent remark was harmless beyond a reasonable doubt.
We also reject appellant's contention that he was entitled to an instruction on the affirmative defense of voluntary intoxication. In Linehan v. State, 476 So.2d 1262, 1264 (Fla. 1985), this Court held that "where the evidence shows the use of intoxicants but does not show intoxication, the instruction is not required." Again, in Gardner v. State, 480 So.2d 91, 93 (Fla. 1985), we stated:
We have held that jury instructions regarding intoxication need not be given in every case in which evidence has been adduced at trial that the defendant had consumed alcoholic beverages prior to the commission of the offense. It is not error to refuse such an instruction when there is no evidence of the amount of alcohol consumed during the hours preceding the crime and no evidence that the defendant was intoxicated.
Here, the only physical evidence of intoxication presented consisted of three beer cans found at the scene of the crime. The only other evidence supporting defendant's theory[2] was the testimony of Fields, an eyewitness to and participant in the murder, who said that earlier in the evening he saw Robinson drinking from a pint of Hennessy cognac, and Robinson's statement to the police which included references to consuming unspecified amounts of cognac, gin and beer. Thus, although there was evidence that Robinson consumed alcoholic beverages the night of the murder, there was no evidence that he was intoxicated. See Jacobs v. State, 396 So.2d 1113, 1115 (Fla.), cert. denied, 454 U.S. 933, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981). Moreover, Fields also testified that Robinson walked and talked fine, drove the car, and appeared normal. Accordingly, we find the trial court's denial of the requested instruction was not erroneous in view of our rulings in Linehan and Gardner.
We reject as meritless appellant's remaining argument that the trial court's interruption of defense counsel's closing argument, to which counsel did not object, rose to the magnitude of fundamental error.

Penalty Phase
We vacate Robinson's death sentence because we agree with appellant that the state impermissibly argued a nonstatutory aggravating factor and injected evidence calculated to arouse racial bias during the penalty phase of his trial.
During closing argument at the penalty phase, the prosecutor stated to the jury:
One thing to know about Dr. Krop's testimony is the Defendant suffers from antisocial tendencies. He has a total indifference as to who he's hurt, as to *6 killing Beverly St. George. He really doesn't care that much. He showed no remorse, according to Dr. Krop. (Emphasis supplied.)
Defense counsel immediately objected and correctly pointed out that the prosecutor was improperly arguing a nonstatutory aggravating circumstance. The trial court denied the subsequent motion for mistrial.
In Sireci v. State, 399 So.2d 964, 971-72 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982), this Court held that lack of remorse may be considered in finding that a murder was especially heinous, atrocious and cruel. However, as a result of the 1981 revision of the standard jury instructions in criminal cases as well as the consistent misapplication of the Sireci holding, this Court subsequently held that any consideration of a defendant's remorse was extraneous to the question of whether the murder was especially heinous, atrocious or cruel. Pope v. State, 441 So.2d 1073, 1077-78 (Fla. 1983). Citing McCampbell v. State, 421 So.2d 1072 (Fla. 1982), the Court in Pope noted that lack of remorse is not an aggravating factor, in and of itself, and held:
[H]enceforth lack of remorse should have no place in the consideration of aggravating factors. Any convincing evidence of remorse may properly be considered in mitigation of the sentence, but absence of remorse should not be weighed either as an aggravating factor nor as an enhancement of an aggravating factor.
441 So.2d at 1078.
We find even more damaging, however, the cross-examination of appellant's medical expert, during which the prosecutor elicited the following testimony:
MR. ALEXANDER (prosecutor): Would you say, Doctor, that it's a fair statement that the Defendant, Mr. Robinson, is prejudiced toward white people, specifically, women?
DOCTOR KROP: I don't knew if he's prejudiced against them in the way we typically think of prejudice in terms of feeling like whites are worse than blacks or blacks are worse than whites. I think he has probably a lot of hostility built up. I don't know enough about his history in terms of whether there were racial prejudices which occurred substantially in his own background which would back that up, but I think he just has a lot of difficulty with women in general and I really can't say whether it's necessarily a racial hostility.
MR. ALEXANDER: In regard to one of the answers you gave Mr. Pearl, you noted the Defendant had told you about several victims in the past in regard to sexual encounters. Are you familiar with the gender and the race of those particular victims?
DOCTOR KROP: I believe that Mr. Pearl indicated that they were white.
MR. ALEXANDER: Do you know if they were male or female?
DOCTOR KROP: I probably don't know for sure. I presume they were white females.
MR. ALEXANDER: And you know the victim in this case also was a white female, do you not?
DOCTOR KROP: Yes, I do.
At this point, defense counsel approached the bench, objected to the line of questioning, and moved for a mistrial, asserting that the state's examination was an improper attempt to make a racial appeal. Counsel pointed out that Robinson, a black man, was being tried by an all-white jury for the murder of a white woman. The motion for mistrial was denied. Although the judge ordered the prosecutor to steer away from the topic, no cautionary instruction was given to the jury.
We agree with appellant that the prosecutor's examination of this witness was a deliberate attempt to insinuate that appellant had a habit of preying on white women and thus constituted an impermissible appeal to bias and prejudice.
Conduct of counsel during the course of a trial is controllable in the discretion of the trial court, and a court's ruling will not be overturned absent a clear abuse of discretion. Teffeteller v. State, 439 So.2d 840, 845 (Fla. 1983), cert. denied, 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 754 (1984); Paramore *7 v. State, 229 So.2d 855, 860 (Fla. 1969), vacated on other grounds, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972). The prosecutor's comments and questions about the race of the victims of prior crimes committed by appellant easily could have aroused bias and prejudice on the part of the jury. That such an appeal was improper cannot be questioned. The questioning and resultant testimony had no bearing on any aggravating or mitigating factors.[3]
Racial prejudice has no place in our system of justice and has long been condemned by this Court. E.g., Cooper v. State, 136 Fla. 23, 186 So. 230 (1939); Huggins v. State, 129 Fla. 329, 176 So. 154 (1937). Nonetheless, race discrimination is an undeniable fact of this nation's history. As the United States Supreme Court recently noted, the risk that the factor of race may enter the criminal justice process has required its unceasing attention. McCleskey v. Kemp, ___ U.S. ___, 107 S.Ct. 1756, 1775, 95 L.Ed.2d 262 (1987). We cannot, however, by rule of law so quickly eradicate attitudes long held and deeply entrenched. Thus, despite "unceasing" efforts, discrimination on the basis of race persists. As the United States Supreme Court acknowledged in Rose v. Mitchell, 443 U.S. 545, 558-59, 99 S.Ct. 2993, 3001, 61 L.Ed.2d 739 (1979):
[W]e ... cannot deny that, 114 years after the close of the War Between the States ..., racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole. Perhaps today that discrimination takes a form more subtle than before. But it is not less real or pernicious.
The situation presented here, involving a black man who is charged with kidnapping, raping, and murdering a white woman, is fertile soil for the seeds of racial prejudice. We find the risk that racial prejudice may have influenced the sentencing decision unacceptable in light of the trial court's failure to give a cautionary instruction. Our courts consistently have held that the trial judge should not only sustain an objection to such improper conduct but also should reprimand the offending prosecuting officer in order to impress upon the jury the gross impropriety of being influenced by improper argument or testimony. Gluck v. State, 62 So.2d 71, 73 (Fla. 1952); Deas v. State, 119 Fla. 839, 845, 161 So. 729, 731 (1935); Edwards v. State, 428 So.2d 357, 359 (Fla. 3d DCA 1983). Our cases also have long recognized that improper remarks to the jury may in some instances be so prejudicial that neither rebuke nor retraction will destroy their influence, and a new trial should be granted despite the absence of an objection below or even in the presence of a rebuke by the trial judge. Pait v. State, 112 So.2d 380, 385 (Fla. 1959); Ryan v. State, 457 So.2d 1084, 1091 (Fla. 4th DCA 1984); Peterson v. State, 376 So.2d 1230, 1234 (Fla. 4th DCA 1979), cert. denied, 386 So.2d 642 (Fla. 1980); Ailer v. State, 114 So.2d 348, 351 (Fla. 2d DCA 1959).
We emphasize that the risk of racial prejudice infecting a criminal trial takes on greater significance in the context of a capital sentencing proceeding. In Turner v. Murray, 476 U.S. 1, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986), in which the United States Supreme Court held that capital defendants accused of interracial crimes have a constitutional right to question prospective jurors on the issue of racial bias, the Court based its decision on two factors unique to the capital sentencing proceeding. First, in a capital sentencing proceeding before a jury, the jury is called upon to make a "highly subjective, `unique, individualized judgment regarding the punishment that a particular person deserves.'" Id. 106 S.Ct. at 1687 (citations omitted). *8 Due to the nature of the individualized judgment that the jury must make in a capital sentencing proceeding, there is a greater opportunity for latent racial bias to affect its judgment than when the jury is acting merely as factfinder.[4]Id. at 1688 n. 8. As the Court further explained:
Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected. On the facts of this case, a juror who believes that blacks are violence-prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified under Virginia law. Such a juror might also be less favorably inclined toward petitioner's evidence of mental disturbance as a mitigating circumstance. More subtle, less consciously held racial attitudes could also influence a juror's decision in this case. Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime, might incline a juror to favor the death penalty.
Id. at 1687 (footnote omitted).
Second, the Turner Court pointed out that although there is some risk of racial prejudice whenever there is a crime involving interracial violence, the risk of improper sentencing in a capital case is "especially serious" due to the complete finality of the death sentence. Id. at 1688.
Accordingly, under the circumstances of this case, particularly in the absence of a cautionary instruction, we cannot presume that the prejudicial testimony did not remain imbedded in the minds of the jurors and influence their recommendation. Because we cannot say beyond a reasonable doubt that the jury's recommendation was not motivated in part by racial considerations, we cannot deem the error harmless. See Chapman v. State, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); State v. DiGuilio, 491 So.2d 1129, 1139 (Fla. 1986). We thus reverse the death sentence and remand to the trial court to hold a new sentencing proceeding before a jury.
Because resentencing is necessary, we need not reach appellant's claim that the trial court erred in its conclusions as to the aggravating factors.
Next, appellant argues that the trial court erred in imposing three consecutive life sentences for the three noncapital offenses following a guidelines recommendation of life imprisonment without stating clear and convincing reasons for departure. We find this claim meritorious under Rease v. State, 493 So.2d 454 (Fla. 1986). The record indicates that the trial judge did not believe the imposition of consecutive life sentences was a departure. Accordingly, we vacate the consecutive life sentences and remand for resentencing.
Appellant's final issue for review, encompassing numerous challenges to the constitutionality of Florida's capital sentencing statute, is wholly without merit. See Stano v. State, 473 So.2d 1282, 1289 (Fla. 1985), cert. denied, 474 U.S. 1093, 106 S.Ct. 869, 88 L.Ed.2d 907 (1986).
In summary, Robinson's conviction for first-degree murder is affirmed. His convictions for kidnapping, armed robbery, and sexual battery are remanded for resentencing. His death sentence is vacated and remanded for a new sentencing proceeding before a jury.
It is so ordered.
McDONALD, C.J., and OVERTON, EHRLICH, SHAW, GRIMES and KOGAN, JJ., concur.
NOTES
[1] Jurors must be 18 years of age, citizens of the state of Florida, and registered electors of their respective counties. § 40.01, Fla. Stat. (1985). Jurors may not be under prosecution for any crime; have been convicted of bribery, forgery, perjury larceny, or any felony, unless restored to civil rights; be the Governor, a Cabinet officer, a sheriff or deputy, a municipal police officer, a clerk of the court, or a judge. §§ 40.013(1) & (2), Fla. Stat. (1985).
[2] Appellant's reliance on Dr. Krop's testimony is unavailing because Dr. Krop did not testify during the guilt phase.
[3] We disagree with the trial judge's conclusion that the testimony was proper because it was brought up by defense counsel on direct. The only reference to race made by Dr. Krop on direct was his testimony that the defendant stated that he shot the victim the second time because "he wouldn't get a lot of mercy from having shot `a white woman.'" This testimony does not justify prosecutorial speculation that the defendant's crimes were racially motivated. Nor do we believe defense counsel's apparent attempt to rebut the prosecutor's innuendos on redirect were sufficient to cure any risk of prejudice.
[4] The Court recognized that the degree of discretion given to the jury varies from state to state. Although Virginia's capital sentencing scheme, at issue in Turner, gives the jury greater discretion in some respects than Florida's death penalty statute, we find the Turner principle equally applicable here because a capital sentencing jury in Florida is required to make the same kinds of judgments in reaching a sentencing decision. For example, under both systems, the jury must determine whether certain enumerated aggravating factors are present and weigh those against any mitigating evidence offered by the defendant.