**Robert Dale HENDERSON,**
**Petitioner–Appellant,**

v.

**Richard L. DUGGER, Secretary, Florida**
**Department of Corrections,**
**Respondent–Appellee.**

**No. 88–3680.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 20, 1991.

Billy H. Nolas, Larry H. Spalding, Martin J. McClain, Office of Capital Collateral Representative, Tallahassee, Fla., for petitioner-appellant.

Richard B. Martell, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for respondent-appellee.

Before FAY, HATCHETT and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Robert Dale Henderson appeals the district court's refusal to grant the writ of habeas corpus. Henderson asserts nine grounds for reversal: the violation of his right to counsel during the taking of his confessions, prejudicial pretrial publicity, the ineffectiveness of his mental health expert, his involuntary absence from several proceedings, the overbroad construction of certain aggravating factors, an erroneous charge to the jury concerning the presumptions they were to apply in the case that they found at least one aggravating factor, the use of nonstatutory aggravating circumstances in setting his sentence of death, the refusal of the trial judge to instruct the jury as to their merciful discretion, and ineffective assistance of counsel on direct appeal to the state supreme court. We find none of these claims compelling, and we affirm.

## I. BACKGROUND

The Charlotte County, Florida, police received a call on February 6, 1982, reporting an auto burglary. When officers arrived at the scene, appellant Henderson surrendered himself and stated that he was wanted for murder in several states. Henderson had apparently made the call to the police in order to facilitate his surrender. During questioning by the Charlotte County authorities, Henderson implicated himself in two murders that had occurred in Putnam County, Florida. Henderson soon invoked his right to counsel, and the Charlotte County public defender's office was contacted.

As a result of the statements to the Charlotte County police, Putnam County Officers Bakker and Hord arrived to transport Henderson to their jurisdiction on February 10, 1982. At a formal hearing during which Henderson was turned over to Bakker and Hord, the Putnam County officers were presented with a form that Henderson had executed, invoking his right

to counsel and stating that he would not talk to the police under any circumstances without his attorney present.

At the end of the approximately five-hour trip to Putnam County, Bakker and Hord obtained a written waiver of Henderson's previously invoked rights to counsel and silence, and Henderson confessed to killing three hitchhikers in Hernando County. Henderson also agreed to show the officers where the bodies were.

On June 2, 1982, Henderson pled guilty to the Putnam County charges, for which he received two life sentences. Afterwards, he was transported to Hernando County. During the trip, Officer Perez, the transporting officer, encouraged Henderson to make further incriminating statements. Henderson at first refused but eventually talked to Perez about the Hernando County murders.

Due to excessive pretrial publicity, Henderson's trial on the Hernando County charges was moved to Lake County, Florida, approximately thirty miles from Hernando County. The prosecution's case in the guilt phase was based on the testimony of Officers Bakker, Hord, and Perez. The defense presented no evidence. Henderson was found guilty by the jury on November 20, 1982.

Evidence introduced by the prosecution during the sentencing phase included copies of the Putnam County judgments and the testimony of Officer Perez as to a statement made by Henderson allegedly showing lack of remorse. Henderson called a reporter to testify as to Henderson's personal history.

The jury recommended death, and the trial judge imposed a sentence of capital punishment, finding three statutory aggravating circumstances and unspecified nonstatutory mitigating circumstances. On direct appeal, the Florida Supreme Court affirmed Henderson's conviction and sentence.[1] Henderson's state habeas proceedings were unsuccessful.[2] The United

---

1. *Henderson v. State*, 463 So.2d 196 (Fla.), *cert. denied*, 473 U.S. 916, 105 S.Ct. 3542, 87 L.Ed.2d 665 (1985); *see also id.* at 198–99 (setting out further factual details of the crime).

2. *Henderson v. Dugger*, 522 So.2d 835 (Fla.1988).

States District Court for the Middle District of Florida denied Henderson's application for the writ on June 21, 1988.

## II. EDWARDS VIOLATION

■ Henderson's primary claim for relief on appeal is that his inculpatory statements to Officers Bakker, Hord, and Perez were obtained in violation of *Edwards v. Arizona.*[3] *Edwards* holds that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."[4] Henderson argues that it was the police who initiated the conversations that led to his confessions. There are two relevant confessions, one to Officers Bakker and Hord, the other to Officer Perez. We will discuss each in turn.

### A. *The Confession to Bakker and Hord*

■ Prior to being turned over to the Putnam County officers, Henderson through counsel gave the officers an "Invocation of Right to Counsel" form that expressed his desire not to talk with the police without an attorney present. During the car trip from Charlotte County to Putnam County, Henderson and Officers Bakker and Hord exchanged casual conversation, covering such topics as Henderson's marksmanship skills and his frequent headaches and insomnia. No subjects touching on Henderson's crimes were broached. When the police vehicle reached Crescent City, Florida, inside the Putnam County line, the officers stopped the car at the city police station to call their supervisor and inform him of their arrival within the jurisdiction. When Bakker went inside to make the phone call, Henderson asked Hord what was going to happen next. Hord testified:

I explained to him that we were in Putnam County, that Sergeant Bakker was calling the chief of detectives just to tell

him that we were here. [Henderson] wanted to know what we would do then.... I told him it was up to the captain, but more than likely we'd be heading to the Putnam County Sheriff's Department to the detention facility. He kind of looked at me like it was just, "Is that all," and I asked him what it was he was trying to tell me. He indicated that he wanted—he thought he wanted to assist me in finding some bodies. I told him that he was not in a position to think he wanted to do something, that he had to make up his mind, and he said that he did want to help me in my investigations.

Hord further explained the expression on Henderson's face:

Well, it was just kind of a look on his face like, "You've got to be kidding," you know. "Here I am. I know all these things, and all you're going to do is take me to jail." It's hard to describe an expression.

Following this conversation, Officer Bakker was called back to the car, and he testified:

I went back out there and I re-advised him of his rights. I told him in great detail that he did not have to discuss that with me, and that if he did, he was going against the advice of the Public Defender Woodard. He said he wanted to discuss that matter and that he was concerned about the proper burial of the three.

In front of four witnesses, Henderson signed a waiver form that the officers had prepared prior to the trip. Henderson then led the officers to Hernando County and the bodies of three previously undiscovered murder victims. Because Henderson asked not to talk about the details of the murders, the officers did not question him further.

These facts support the conclusion that Henderson "evinced a willingness and a desire for a generalized discussion about the investigation."[5] Prior to their arrival in Crescent City, Henderson and the offi-

---

**3.** 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

**4.** 451 U.S. at 484, 101 S.Ct. at 1884–85 (footnote omitted).

**5.** *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983).

cers had been having a casual, nonthreatening conversation. As in *Oregon v. Bradshaw*, Henderson then asked Hord an initial question that was to the effect of, "[W]hat is going to happen to me now?" [6] In *Bradshaw*, the Supreme Court held that this question was sufficient to open up the suspect to more direct questioning (via a lie detector test). The Court stated that Bradshaw's question "could reasonably have been interpreted by the officer as relating generally to the investigation." [7] Similarly, this circuit has held that the question, "Where are we going?" by a suspect allows police to make statements that could encourage the suspect to confess. [8]

A second factor in our conclusion that Henderson's statement was voluntarily given is that Hord did not directly question Henderson or bring up the ongoing criminal investigation; instead, he asked a broad question to which Henderson could have given many replies. When Officer Hord asked what Henderson was attempting to communicate to him, Henderson could have as easily replied that he was in some sort of physical discomfort as that he wanted to show Hord the bodies. This was clearly not a case where the police were repeatedly asking the suspect to come clean. The fact that the question asked was open-ended lends credence to Hord's claim that Henderson was trying to tell him something, and that Hord's question was merely the catalyst. Had Hord asked a more direct question, our conclusion might well be different. In that case, we would not possess the reliability derived from the fact that Henderson gave a specifically incriminating answer in response to a very broad question; in that case, the police would be directly suggesting that Henderson should confess despite his attorney's specific instructions not to talk further. [9]

As an aside, we note that Henderson has referred us to the recent Supreme Court case of *Minnick v. Mississippi* [10] as possibly informing our opinion. *Minnick* is not applicable, because it only holds that—following a request for counsel—an accused's consultation with counsel does not allow the *police* to reinitiate interrogation subsequently. Henderson's case does not turn on the fact that he was provided with counsel after requesting it; it turns completely on whether he initiated the confession. The Court in *Minnick* commented, "*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities; but that is not the case before us. There can be no doubt that the interrogation in question was initiated by the police; it was a formal interview which petitioner was compelled to attend." [11] Therefore, Henderson's prior request for counsel is irrelevant as long as he initiated the confession.

We hold that Henderson in fact initiated the confession. We are careful to add that this holding is a result of our conclusion that Henderson himself asked a question initially that could have been taken as relating to his crimes, and that the confession was in response to a quite open-ended question. A holding that Henderson initiated his confession through nonverbal communication would allow police to interrogate suspects who have invoked their right to counsel on the basis of police interpretations of suspects' demeanors, facial expressions, and so on. A twitch of the cheek could be taken as a desire to confess. Such a rule would effectively wipe out the protections that cases such as *Edwards v. Arizona* provide.

---

**6.** 462 U.S. at 1042, 103 S.Ct. at 2833.

**7.** 462 U.S. at 1046, 103 S.Ct. at 2835.

**8.** *United States v. Valdez*, 880 F.2d 1230, 1232, 1234 (11th Cir.1989) ("Agent Brady's statements were in response to Valdez' question regarding his destination, they were not in the form of interrogatories.").

**9.** *See, e.g., United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir.1986) (evidence suppressed where, after suspect requested a lawyer, agent engaged suspect "in a discussion relating directly and indirectly to the investigation").

**10.** ——— U.S. ———, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

**11.** 111 S.Ct. at 492.

## B. *The Confession to Perez*

■ On June 11, 1982, Officer Perez transported Henderson from the Raiford State Prison to Hernando County. Henderson was at this time represented by counsel in both Putnam and Hernando Counties. During the trip, Perez read Henderson his rights and then showed him a picture of one of the victims, asking, "Do you recognize the person in this picture?" Henderson replied, "No comment." A few minutes later, Perez again asked about the murders. Henderson replied, "I already told other detectives and I know about what you're investigating, and I know you have copies of my statement." Perez replied that he wanted to have clarification of some of the events surrounding the murders, but Henderson remained silent, and Perez asked no more questions. When the vehicle stopped so headquarters could be advised they were approaching, Henderson gave Perez a tape-recorded confession, apparently unprompted, first saying, "Give me a Pepsi and a pack of Winstons and I'll tell you about this shit."

Henderson contends that his will was overborne by Perez' persistent questioning. However, this court's precedents clearly hold that where a suspect changes his mind with regard to giving a confession to the police—even after an invocation of the right to counsel—the confession is admissible. For example, in *Moore v. Dugger*,[12] we held that "[i]f a suspect clearly, of his own volition, changes his mind about wanting counsel, we see nothing … to require that the withdrawn request for counsel continue in force." [13] In *Moore*, the suspect asked for counsel; questioning stopped; and then the suspect said, "Never mind, I'll finish telling you right now." [14] Although some might contend that Henderson's trade of a confession for a soft drink and a smoke was ill-taken, there is nothing in the record before us to indi-

cate that, as in *Moore*, the confession was not initiated and volunteered by Henderson.

■ Even were we to find the confession recorded by Perez inadmissible, its admission was harmless, as Henderson had already explicitly confessed to the same murders to the Putnam County authorities. Although this later confession was used to provide further details of the murders, there can be no contention that the state did not already have sufficient evidence to convict and to support a death sentence prior to June 11, 1982.

## III. PRETRIAL PUBLICITY

Henderson's confessions to numerous murders produced a spate of news reports in Hernando County and throughout central Florida. In February 1982, a Hernando County Circuit Court judge issued a gag order to prevent adverse publicity from affecting Henderson's trial. However, the order was ineffectual, and after three days of voir dire in Hernando County, it became apparent that many of the jurors were tainted by the publicity. The trial judge therefore granted Henderson's motion for a change of venue. A new jury was empaneled in Lake County, also located in central Florida. Henderson's renewed motion for a change of venue was denied, and trial proceeded in Lake County.

Henderson's argument, based on *Rideau v. Louisiana*,[15] is that the pretrial publicity was "so pervasive[ ]" [16] that prejudice must be presumed. In particular, he maintains that the publicity surrounding his previous confessions tainted the Lake County venire beyond repair. But because we have found that his confessions were admissible, the damage if any from the publicity is negligible.

Henderson did not raise this claim on direct appeal to the Florida Supreme Court,

---

**12.** 856 F.2d 129 (11th Cir.1988).

**13.** *Id.* at 133.

**14.** *Id.*

**15.** 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

**16.** 373 U.S. at 726, 83 S.Ct. at 1419; *see also Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir.1985), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986).

and that court has found the claim procedurally barred.[17] The district court found that this claim was procedurally defaulted. Although Henderson argues that his claim of cause requires an evidentiary hearing, we note that "[w]hen a claim of ineffective assistance of counsel is based on failure to raise issues on appeal, ... it is the exceptional case that could not be resolved on an examination of the record alone."[18]

▋ Henderson alleges cause for the default, arguing that his counsel on direct appeal was ineffective. Regardless of whether his appellate counsel was ineffective,[19] we conclude that Henderson cannot demonstrate the prejudice necessary to excuse his procedural default. First, the Lake County jurors might have been exposed to articles discussing Henderson's case, but the articles have not been alleged to be inflammatory. The more inflammatory articles from Hernando County and Tampa were not read by the jurors in Lake County. Second, the jury selection was fair. Most of the venire indicated that they had no knowledge of Henderson or the crimes. The prospective jurors that did have any knowledge were questioned individually, and those several were removed for cause. In addition, Henderson did not use all of his peremptory challenges. After reviewing the record, the district court found that the jury was composed only of the jurors who knew nothing of Henderson or the case. This falls far short of *Coleman v. Kemp*'s requirement that an "'extreme situation'"[20] exist prior to presuming prejudice from pretrial publicity.

## IV. INEFFECTIVENESS OF MENTAL HEALTH EVALUATION

▋ Henderson makes several points in his third argument, all of which relate to the mental health aspects of his trial. Relying on *Ake v. Oklahoma*,[21] he complains about the assistance rendered by his ap-

pointed mental health expert and argues that the evidence shows that he was insane at the time of the crime. In addition, he argues that he was incompetent at the time of trial and that his counsel should have recognized this and pled incompetence.

The district court denied relief on the mental health claims, holding that the extensive, five-day state postconviction evidentiary hearing established that no error occurred. The following are the district court's findings in regard to the claim that Henderson's psychiatrist incompetently determined that Henderson was sane at the time of the crime:

The mental health expert who evaluated Petitioner before trial testified at [the state postconviction evidentiary] hearing, as did two associates who assisted the doctor, two doctors who evaluated Petitioner in regard to offenses committed in Putnam County, Florida in 1982, a doctor who interpreted the CAT scan in 1982, and a psychologist retained by Petitioner's counsel who examined Petitioner in 1987. In addition, Petitioner's trial counsel testified....

... After reviewing the transcript of the evidentiary hearing and the trial court's decision therefrom, this Court finds that the trial court's factual conclusions are fairly supported by the record. All mental health experts, except for the expert presented by Petitioner, testified that the evaluation done before trial was done competently. The trial court was able to observe the demeanor of the witnesses and to make credibility determinations based upon the testimony. Therefore, this Court concludes that Petitioner is not entitled to relief on this claim.

Essentially, the state's experts testified at the postconviction hearing that Henderson had mild personality disorders and the defendant's expert, Dr. Carbonnell, testified that he had more serious disorders. Dr. Carbonnell also testified that the crime was

**17.** *Henderson v. Dugger*, 522 So.2d at 836 n. 1.

**18.** *Gray v. Greer*, 800 F.2d 644, 647 (7th Cir. 1985).

**19.** *See* section X, *infra*.

**20.** 778 F.2d at 1490 (quoting *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir.1980)).

**21.** 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

impulsive. However, the facts of the case would seem to indicate otherwise—the victims were bound. In addition, Dr. Carbonnell's other claims of mental illness at the time of the crime were all contradicted by other witnesses. The contention of organic brain syndrome was refuted, for example, by a 1982 brain scan showing no evidence of disorder.

Henderson thus contends that his trial expert's testimony was not sufficiently favorable and that his constitutional rights were therefore violated. This court's decision in *Martin v. Wainwright*[22] controls Henderson's claim on the insanity issue. In *Martin,* the argument that a defendant is entitled to a favorable psychiatric opinion was rejected.[23]

██ Concerning the issue of Henderson's competence to stand trial, the district court also rejected Henderson's argument, finding:

> During the [five-day state evidentiary] hearing, Petitioner's counsel testified that Petitioner was capable of, and in fact did, assist in the preparation of his defense. The mental health experts, except for the expert presented by Petitioner, testified that he was competent. Furthermore, these witnesses testified that Petitioner had a rational and factual understanding of the proceedings against him. Presented with this evidence, the trial court's conclusion that Petitioner was competent to stand trial, and is competent at present is fairly supported by the record.

The evidence related by the district court conclusively shows that Henderson was competent to stand trial, and its findings are in no sense clearly erroneous.

## V. INVOLUNTARY ABSENCES DURING PROCEEDINGS

Henderson challenges as a violation of the Constitution two instances during the general jury qualification at which he was not present. The first instance involved the jury qualification in Hernando County that was later aborted after the change of venue motion was granted. Henderson argues that, had he been present, he might have decided against asking for a change of venue to Lake County. But given his arguments concerning the constitutional inadequacy of the jury empaneled in Lake County, where the exposure to news reports was even less prevalent, this contention seems implausible.

██ Second, whether Henderson was absent during the general jury qualification in Lake County is disputed. The record indicates that the defendant was there. This is controverted by the defendant. Even if Henderson was absent, a general qualification of the jury is not a "critical stage" in the proceedings. The court was merely deciding which jurors were to be excused for age, hardship, etc. It is difficult to see what the defendant could have added to this proceeding.[24]

## VI. OVERBROAD APPLICATION OF AGGRAVATING FACTORS

The state argues, and the district court found, that Henderson had procedurally defaulted on this claim—that the jury instructions as to the "especially heinous, atrocious, or cruel" and "cold, calculated, and premeditated" aggravating factors were insufficiently specific—by failing to raise it before the Florida Supreme Court on direct appeal. Our examination of the trial record and Henderson's brief on direct appeal shows that Henderson clearly raised this issue before the state trial court.[25]

---

**22.** 770 F.2d 918 (11th Cir.1985), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).

**23.** *Id.* at 935 ("we reject the notion that either *Ake* or the due process clause requires the appointment of an expert who would reach a conclusion favorable to the defendant"); *see also Finney v. Zant,* 709 F.2d 643, 645 (11th Cir.1983).

**24.** *See Hall v. Wainwright,* 805 F.2d 945, 947 (11th Cir.1986), *cert. denied,* 484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1987).

**25.** *See* Trial Transcript, at 1570–71 (Henderson's counsel: "The standard jury instructions used to define this aggravating circumstance. I don't believe they do that anymore. Without that definition, this aggravating circumstance is unconstitutionally vague and over broad."); *id.* at 1575–76.

Henderson raised a slightly different version of the claim on direct appeal, referring only to Florida's construction of the aggravating factors.[26] Henderson attempted to raise the issue in seeking state postconviction relief, but the Florida Supreme Court found it procedurally barred.[27] We agree that the claim that the vagueness of the jury *instructions* is barred but also hold that Henderson's related claim that the statute's *construction* is overbroad is properly before this court, as this latter claim was raised before both the Florida trial and appellate courts.

On the merits, Henderson's claim is that Florida's construction of two aggravating factors failed to narrow his sentencer's discretion, as required by *Maynard v. Cartwright*[28] and *Godfrey v. Georgia*.[29] The Florida Supreme Court has adopted narrowing constructions of these two aggravating circumstances that this court has determined to be sufficiently limiting. For example, *Harich v. Wainwright*[30] found that the Florida Supreme Court has adequately narrowed both the "especially heinous, atrocious, or cruel" aggravating circumstance,[31] and the "cold, calculated, and premeditated" aggravating circumstance.[32]

The trial court in this case found ample support for its conclusion that both aggravating factors applied. When considering the application of the "heinous, atrocious, or cruel" factor, the court noted that the evidence showed that two of the three victims were bound, hand and foot, with adhesive tape; that Henderson joked with the two bound victims prior to shooting them; that Henderson forced the third victim to bind the other two victims and to watch their shooting; and that the third victim tried to break free and was then shot at close range. This would seem to amount to a " 'conscienceless or pitiless crime which is unnecessarily torturous to the victim.' "[33] As to the "cold, calculated, and premeditated" aggravating factor, the trial court found that the fact that the victims were bound prior to being shot supported the additional level of premeditation necessary to justify this aggravating factor. We therefore refuse to disturb Henderson's sentence on these grounds.

## VII. BURDEN–SHIFTING JURY INSTRUCTIONS

■ Although the district court found this claim procedurally barred, we conclude that a sufficiently related argument was raised before the state courts in proper procedural stance.[34]

Henderson claims that the following jury instruction improperly shifted the burden of proof to him in proving that a life sentence was appropriate:

> If you find the aggravating circumstances do not justify the death penalty,

---

**26.** *See* Initial Brief of Appellant (appeal to the Supreme Court of Florida), at 38 ("The statute ... does not sufficiently define for the jury's consideration each of the aggravating circumstances listed in the statute. *See Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).").

**27.** *Henderson v. Dugger*, 522 So.2d at 836 n. * (claim 15).

**28.** 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

**29.** 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

**30.** 813 F.2d 1082 (11th Cir.1987), *aff'd en banc in pertinent part*, 844 F.2d 1464 (11th Cir.1988), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989).

**31.** *Id.* at 1104.

**32.** *Id.* at 1102 ("the Florida courts have construed [the aggravating circumstance] to require a greater degree of premeditation and cold-bloodedness than is required to obtain a first degree murder conviction" (citation omitted)).

**33.** *Proffitt v. Florida*, 428 U.S. 242, 255, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976) (citations omitted) (upholding Florida's construction of "heinous, atrocious, or cruel" aggravating factor).

**34.** *See* Trial Transcript, at 1568–70, 1574; Initial Brief of Appellant (appeal to the Supreme Court of Florida), at 38 ("The capital sentencing statute in Florida fails to provide any standard of proof for determining that aggravating circumstances 'outweigh' the mitigating factors, *Mullaney v. Wilbur*, 421 U.S. 684 [95 S.Ct. 1881, 44 L.Ed.2d 508] (1975), and does not define 'suffi-

your advisory sentence should be one of life imprisonment without possibility of parole for twenty-five years.

Should you find sufficient aggravating circumstances do exist, it will then be your duty to determine whether the mitigating circumstances exist that outweigh the aggravating circumstances.

In *Bertolotti v. Dugger*,[35] we previously addressed and rejected the same argument made from a similar charge, which apparently follows a pattern jury instruction. As in *Bertolotti*, the trial judge in Henderson's case also explained that all aggravating circumstances must be established beyond a reasonable doubt before they were considered; once established, they were to be weighed against "all of the evidence tending to establish one or more mitigating circumstances."[36] The court in *Bertolotti* held, "If the jury did find that the aggravating circumstances justified the death penalty, it was to determine whether *any* other aspect of Bertolotti's record or character or offense stood in mitigation of his crime. This set of instructions adequately described the plan of Florida's capital-sentencing statute, quite reasonably focused the jury's attention on the circumstances of the offense and the character of the offender, and adequately bridled the jury's discretion."[37] We similarly find that the jury charge at issue here did not cause the jury to presume that death was the appropriate penalty.[38]

## VIII. CONSIDERATION OF NONSTATUTORY AGGRAVATING FACTORS

We reject Henderson's argument that three quantities of evidence were errone-

ously considered by the sentencing court in aggravation of his sentence. These three matters are: (1) the partial state of undress of one of the victims; (2) the fact that Henderson had committed prior murders; and (3) his alleged lack of remorse. As to claims (1) and (2), we uphold the district court's determination that these claims were procedurally barred, because they were not presented to the Florida Supreme Court on direct appeal, and because appellant has failed to establish cause and prejudice for this omission. Claim (3) was presented to the Florida courts, and we address it on its merits.

Henderson points to three events that show that his lack of remorse was improperly considered by the trial court.[39] During the sentencing proceedings, the prosecutor questioned Officer Perez as to whether Henderson had related anything about his life. Perez said he asked Henderson, "Due to the conversation we were having and his life, knowing what you know now, if you had to live your life over again, would you change anything, and he said, 'Definitely not.'" During closing argument, the prosecutor stated, "Let us recall some of the testimony, also indicating the Defendant's manner, cold, no remorse." Finally, Henderson claims that the trial judge relied on his lack of remorse in imposing a sentence of death.

We find that the statements by the prosecutor and Officer Perez concerning Henderson's lack of remorse were isolated comments that did not affect the fundamental fairness of the trial.[40] Moreover, the sentencing court clearly did not rely

---

cient aggravating circumstances.'"); *Henderson v. Dugger*, 522 So.2d at 836 n. * (issue 13).

**35.** 883 F.2d 1503, 1524–25 (11th Cir.1989), *cert. denied*, ―― U.S. ――, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990).

**36.** *Id.* at 1525.

**37.** *Id.* (emphasis in original) (citations omitted).

**38.** *See also Walton v. Arizona*, ―― U.S. ――, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511 (1990) ("[A] defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to

call for leniency."). *But cf. Jackson v. Dugger*, 837 F.2d 1469, 1473 (11th Cir.), *cert. denied*, 486 U.S. 1026, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988) (instruction that "death is presumed to be the proper sentence" unconstitutional).

**39.** *See, e.g., Robinson v. State*, 520 So.2d 1, 6 (Fla.1988) (lack of remorse may not be considered by capital sentencer).

**40.** *See Knight v. Dugger*, 863 F.2d 705, 710, app. at 739–40 (11th Cir.1988) (reprinting district court opinion) ("[T]he prosecution did not harp on this point. It was mentioned once in only one sentence. The prosecutor did not single out

upon these statements in passing sentence but merely noted in its recapitulation of the state's case that a lack of remorse had been urged by the prosecution.[41] The trial judge charged the jury that they were to consider only the enumerated aggravating circumstances, and we presume the trial judge followed his own instructions in making his final sentencing determination.[42]

## IX. PRECLUSION OF MERCY

■ The trial court refused to charge the jury that, after their consideration of the aggravating and mitigating factors, they could recommend mercy regardless of their findings. Appellant contends that this refusal prevented the jury from "considering, as a mitigating factor, any aspect of [his] character or record ... that [he] proffer[ed] as a basis for a sentence less than death."[43] However, this court has repeatedly rejected this argument, requiring only "that the trial court correctly explain the function of aggravating and mitigating circumstances under state law."[44] Henderson's trial judge charged the jury correctly as to Florida law, and no relief can be granted.

## X. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Henderson's final argument is that his counsel on direct appeal was ineffective for failing to raise a number of claims that were later procedurally barred. In addition to the claims discussed above that the district court found barred, Henderson ar-

gues that two further points were incompetently omitted from his direct appeal to the Florida Supreme Court. These are that two of the aggravating circumstances found in his trial were based on the same facts, and that the jury was given a lessened sense of their responsibility for their recommendation.

### A. *Doubling of Aggravating Factors*

■ Henderson points out that the trial court in its sentencing determination relied on the same facts—that his victims were bound prior to being shot—in finding the "heinous, atrocious, or cruel" and the "cold, calculated, and premeditated" aggravating factors. Although the Florida Supreme Court has condemned such double-counting of certain aggravating factors when both factors relate to the same aspect of the crime,[45] that court has also rejected the same argument that Henderson now makes. It has held that the same facts may be used to support more than one aggravating circumstance as long the facts reveal different characteristics of the crime.[46] For example, in Henderson's case, the fact that he bound his victims prior to the murder shows both that the victims suffered mental anguish and that he had a heightened level of premeditation in planning and carrying out the murders.

Moreover, by the time of Henderson's direct appeal, which was filed in 1983, the Florida Supreme Court had already rejected claims identical to those that Henderson now makes.[47] Appellate counsel could

---

Petitioner's lack of remorse as an aggravating circumstance.").

**41.** *See Sullivan v. Wainwright,* 695 F.2d 1306, 1312 (11th Cir.) ("The trial judge did not denominate lack of remorse as an aggravating factor, but noted it in his findings."), *cert. denied,* 464 U.S. 922, 104 S.Ct. 290, 78 L.Ed.2d 266 (1983).

**42.** *See Adams v. Wainwright,* 709 F.2d 1443, 1447 (11th Cir.1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984).

**43.** *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) (emphasis and footnote omitted).

**44.** *Bertolotti,* 883 F.2d at 1526 (citation omitted).

**45.** *See Provence v. State,* 337 So.2d 783, 786 (Fla.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977).

**46.** *See Hill v. State,* 422 So.2d 816, 818–19 (Fla. 1982), *cert. denied,* 460 U.S. 1017, 103 S.Ct. 1262, 75 L.Ed.2d 488 (1983) (no impermissible doubling of aggravating factors where murder/rape sufficiently torturous and where decision to murder was made substantially before the crime; *see also Mills v. State,* 462 So.2d 1075, 1081 (Fla.) (no impermissible doubling where prospect of murder created mental anguish in victim and murder sufficiently premeditated), *cert. denied,* 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985).

**47.** *See Hill,* 422 So.2d at 818–19.

have reasonably concluded that such a claim would be fruitless. Counsel on direct appeal also separately challenged the application of both aggravating circumstances before the Florida Supreme Court, which found no error in the simultaneous use of the two factors.[48]

### B. Jury's Lessened Sense of Responsibility

 Henderson argues that his appellate counsel was ineffective in that counsel failed to appeal the trial court's refusal to charge the jury that their "recommendation is entitled and must be given by the Court great deference and a lot of weight under the decision of Tedder versus State." This *Caldwell v. Mississippi*[49] error was exacerbated, Henderson contends, when some prospective jurors expressed inaccurate perceptions concerning their role in the sentencing process and when the trial judge informed the jury that, for example, "[t]he final decision as to punishment which should be imposed rests solely with the Judge of the court."

We hold that it did not constitute ineffective assistance to omit to appeal the refusal to give the requested instruction. The remarks made by members of Henderson's venire panel did not contribute to any unfairness in his trial, because these venirepersons did not sit on the jury and their remarks were made during sequestered voir dire. And the instruction, known as a *Tedder* instruction, has never been mandatory under Florida law.[50] This court has expressly rejected the contention that the failure to give a *Tedder* instruction is error.[51]

As to Henderson's general claim of ineffective assistance on direct appeal, we find that appellate counsel did present almost all of the claims now raised. Henderson has thus failed to show that appellate counsel's performance was "objectively unreasonable" and "below the wide range of competence demanded of attorneys in criminal cases."[52]

## XI. CONCLUSION

We find no merit in any of Henderson's claims. The decision of the district court is AFFIRMED.

---

**48.** *Henderson v. State,* 463 So.2d at 201.

**49.** 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

**50.** *See Hardwick v. Wainwright,* 496 So.2d 796, 798 (Fla.1986) (instruction based on *Tedder v. State,* 322 So.2d 908, 910 (Fla.1975) (per curiam), not required to be given), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1987, 95 L.Ed.2d 827 (1987).

**51.** *See Harich v. Dugger,* 844 F.2d 1464, 1475 n. 16 (11th Cir.1988) (en banc) ("The Florida trial judge uses this *Tedder* standard when determining whether to override the jury's verdict of life imprisonment. We can find no reason why the jury would not take their role seriously simply because the trial judge did not inform them of a rule of law applicable only to him." (citation omitted)), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989).

**52.** *Cross v. United States,* 893 F.2d 1287, 1290 (11th Cir.1990) (citations omitted).