748 So.2d 1012 (1999)
David JONES, Appellant,
v.
STATE of Florida, Appellee.
No. 90,664.
Supreme Court of Florida.
November 12, 1999.
Rehearing Denied January 12, 2000.
*1015 Nancy A. Daniels, Public Defender, and W.C. McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Mark S. Dunn, Assistant Attorney *1016 General, Tallahassee, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon David Wyatt Jones. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm the conviction and sentence.

I. FACTS
David Jones, who was thirty-six years old at the time of the crime, was convicted of the first-degree murder of Lori McRae. The evidence at trial revealed that McRae was abducted from a parking lot in the early morning hours of January 31, 1995. Her body was found abandoned in a wooded area in a neighboring county. The most likely cause of death was ligature strangulation.
The evidence revealed that over the two days following her abduction, Jones stole $600 from McRae's ATM account. The first withdrawal, for $300, occurred at 3:09 a.m. on the morning of the murder. Jones was captured on the film of the bank's security camera while making that transaction. Jones eventually attempted over 100 withdrawals in the next two days, but only eleven were successful. Jones was apprehended on February 1 near an ATM machine that police were staking out. At the time, he was driving McRae's Chevy Blazer.
When Jones was arrested he had bloody scratches on his face and reddish stains on his jeans, which later DNA testing revealed "almost conclusively" was McRae's blood. Traces of blood were found in the Blazer as well. The State also presented the testimony of two automobile detailers who testified that Jones attempted to have the interior of the Blazer cleaned on the day after McRae's disappearance.
After his arrest, Jones was transported to police headquarters and questioned by Detective Parker of the Jacksonville Sheriffs Office, the lead investigator in the case. Jones was properly advised of his rights under Miranda,[1] and initially denied his involvement in McRae's disappearance. He eventually terminated the interview, invoking his right to remain silent and asking to speak with his attorney. Twenty days later, Jones confessed to Detective Parker that he committed the murder and accompanied police to the location where he had hidden McRae's body. Further details of the events surrounding Jones' confession will be discussed in the analysis portion of the opinion.
McRae's body was badly decomposed; thus, an exact determination of the cause of her death was difficult. The medical examiner opined that she died as a result of "ligature strangulation." Her body exhibited multiple bruises and defensive wounds, and there was a blood stain on her jacket.
There was a rope tied around McCrae's ankles, a cord tied around her neck, and on top of the cord a sleeve from a black sweater. The sleeve from the sweater matched a sweater owned by Jones' wife, and rope found in the trunk of Jones' automobile was of the same type as the rope around McRae's ankles. McRae had on jeans, which were unzipped, exposing her pubic area and buttocks. Whether McRae had been sexually abused could not be determined due to decomposition of the genital area. McRae also had on a blouse, which was missing some buttons. Two buttons later found in McRae's vehicle were from that blouse.
The jury returned a verdict of guilt of first-degree murder, robbery, and kidnaping. During the penalty phase, several witnesses testified regarding Jones' addiction to crack cocaine, use of other drugs, and the effect of these drugs on Jones' personality. According to the testimony, Jones began "drinking and drugging" when he was fourteen or fifteen years old. *1017 Jones' wife reported that he began serious abuse of illegal substances in 1986, when he began "shooting up" cocaine and dilaudid. He began smoking crack cocaine in 1994, quickly escalating to the point where he spent all his time seeking and smoking crack, often neglecting to eat, bathe, or sleep. Jones' wife testified that they financed their crack habit with extensive shoplifting.
Defense counsel also called Drew Edwards to testify as an expert in the penalty-phase proceedings. Edwards offered his testimony as an expert regarding the effect of cocaine on the brain. Edwards testified that Jones was a crack addict, suffering from these symptoms. Edwards made clear that he did not believe addiction to cocaine is an excuse for crime, yet he admitted that a cocaine addict would suffer impairment of his ability to conform his conduct to the requirements of the law. Edwards testified that despite his addiction, Jones would have always known the difference between right and wrong.
Another defense expert testified that Jones has an I.Q. of 78, placing him between the fifth and ninth percentiles of the population. The expert testified that standardized tests revealed that Jones had little ability to control his impulses, but admitted that his motivation to get the right answer during his testing appeared to "vary." She opined that he was able to conform his conduct to the requirements of the law, "provided he's not impaired in some other way."
The penalty-phase testimony also revealed that Jones was previously convicted of the murder of Jasper Highsmith in 1986 in Duval County, Florida. The murder was committed after Jones escaped from jail where he was being held on a burglary charge. Jones was found guilty of seconddegree murder and sentenced to twenty years in prison. He was released from prison in 1992, after serving only six years. According to the presentence investigation report, not submitted to the jury, Jones' criminal history also included convictions for disorderly conduct, burglary, drug possession, DUI, resisting arrest, and shoplifting.
At the conclusion of the penalty-phase proceedings, the jury recommended the death penalty by a vote of nine to three. The trial court accepted the jury's recommendation and sentenced Jones to death. The trial court found the following four aggravators: (1) that the murder was committed during the course of a kidnapping and a robbery; (2) that Jones had previously been convicted of a violent felony (murder); (3) that the murder was heinous, atrocious or cruel (HAC); and (4) that the murder was committed to avoid arrest. The court found the following statutory mitigators, which it gave "some weight": (1) that Jones' capacity to appreciate the criminality of his conduct was substantially impaired; and (2) that the capital felony was committed while Jones was under the influence of extreme mental or emotional disturbance.
The court also found the following nonstatutory mitigators, which it gave "some weight": (1) that Jones was a crack addict; (2) that Jones is the father of a teenaged son[2] and was a good worker and good provider when he was not using drugs on a regular basis; and (3) that jail records after the arrest for the McRae murder indicated that he had exhibited signs of a "psychotic episode." However, as the trial court found in its sentencing order, records one day after the date of Jones' arrest indicated that he showed no signs of mental illness, and no evidence was presented that he was incompetent to proceed or insane at the time of the crime.
On appeal, Jones raises thirteen issues.[3] We address these issues in turn.

*1018 II. GUILT PHASE ISSUES
The first five issues relate to the guilt phase of the trial. In his first point on appeal, Jones argues that his confession to Detective Parker and two statements to corrections officers were admitted against him at trial in violation of his constitutional rights. For the reasons that follow, we conclude that reversal is not warranted on this point.
When Jones was first questioned, on February 1, 1995, he asserted his right to silence and his right to an attorney. As the United States Supreme Court and this Court have made clear, once a defendant has invoked his or her right to counsel, a defendant is no longer subject to police interrogation until counsel has been made available or the suspect initiates further communication with the police. See Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); State v. Owen, 696 So.2d 715, 719 (Fla. 1997). If the suspect subsequently voluntarily initiates contact or communication with the police and validly waives the right he or she had previously invoked, police interrogation can resume. See Smith v. Illinois, 469 U.S. 91, 94-95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); Jennings v. State, 718 So.2d 144, 149-50 (Fla.1998), cert. denied, ___ U.S.___, 119 S.Ct. 2407, 144 L.Ed.2d 805 (1999).[4]
After invoking his right to counsel on February 1, Jones reinitiated contact with law enforcement officials by asking to speak with Detective Parker on February 17. Detective Parker was unavailable at that time, but later, on February 21, went to the jail in response to Jones' request. On February 21, Jones waived his Miranda rights; however, he again denied murdering McRae and provided a location for her body that Detective Parker subsequently found to be inaccurate.
Jones' request to speak with Parker on the 21st was a voluntary initiation of contact within the meaning of Edwards. After initiating this contact, Jones then validly waived his rights. It is uncontroverted that the statements made to Detective Parker after this reinitiation and waiver concerning the location of the body were admissible against Jones. Jones argues, however, that the remainder of the statements and confessions Jones made later that same day, first to two correctional officers and then to Detective Parker, were erroneously admitted against him because he subsequently invoked his right to counsel.
We address in turn the factual underpinnings of the statements to the correctional *1019 officers and then to Detective Parker. The testimony reveals that after providing Detective Parker with the inaccurate location for McRae's body, Jones returned to his cell while Detective Parker went to search that location. Later that same day, Jones volunteered to a correctional officer guarding his cell block that he wanted to confess to the crime and tell where the body could be found. The correctional officer called his supervisor.
When the supervisor arrived, Jones was very emotional and again volunteered, without having been asked any questions, that his mother told him to confess and that he wanted to show police the location of the body and "get right with God." He then stated that he wanted "to talk to his mother, his attorney, and Detective Parker." Jones then "kept going on" until the supervisor interrupted him to advise him of his constitutional rights and his right to make a phone call.
The supervisor then called Detective Parker as requested by Jones. The supervisor asked Officer Vonk to watch over Jones while they waited for Detective Parker to arrive. Jones was very agitated. Jones asked Vonk whether, if he told where the body was, he would be able to speak to his mother. The officer told him that he did not have authority to make that kind of decision. Jones then confessed to the crime.
Jones told Vonk that he had choked the victim, described the woods where the body was located, and told the officer that he wanted to tell Detective Parker where the body could be found. At some time during his contact with the officer, he said that he would like to speak with his attorney "to arrange to either [sic] for the attorney to see my mother or for me to see my mother." Vonk testified that he did not believe that Jones was indicating that he wanted his attorney present. Although most of Jones' statements were spontaneously made to Vonk, Vonk did testify that he asked Jones whether and how he killed the victim. However, Vonk could not be sure if these questions occurred before or after Jones mentioned his attorney or before or after he confessed to the crime.
Soon thereafter, Detective Parker responded to the supervisor's call and arrived at the jail as Jones had requested. When Detective Parker arrived at the jail, Jones approached Parker, told him that he needed to talk to him and "tell him about it." Parker testified that Jones "just started talking right then." Parker had said nothing to Jones and had not asked any questions when Jones began volunteering this information. Parker then interrupted Jones and asked if he had been advised of his rights. Jones said he had been advised of and understood his rights, but that he wanted to talk and tell where the body could be located.
In analyzing whether any of these confessions and statements should have been suppressed, we first note that it is conceded that Jones reinitiated contact with Detective Parker early in the day on the 21st, after having invoked his rights on the 1st, and that this reinitiation and subsequent waiver were valid. Thus, the question becomes whether Jones was subject to interrogation when he made subsequent statements regarding his counsel and, if so, whether these references to an attorney constituted an unequivocal request for counsel so as to require that all questioning cease.
As to the issue of interrogation, Miranda only applies when a defendant is subject to custodial interrogation. See Traylor v. State, 596 So.2d 957, 966 (Fla. 1992) ("Once a suspect has requested the help of a lawyer, no state agent can reinitiate interrogation on any offense throughout the period of custody unless the lawyer is present, although the suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel.") (emphasis supplied); see also Smith, 469 U.S. at 95, 105 S.Ct. 490 ("[I]f the accused invoked his right to counsel, courts may *1020 admit his responses to further questioning" only if he initiated further discussion with police and then waived his rights.); Hauser v. State, 701 So.2d 329, 331 (Fla. 1997); Christmas v. State, 632 So.2d 1368, 1370 (Fla.1994) ("When, however, a defendant voluntarily initiates a conversation with law enforcement officers in which a defendant provides information about that defendant's case, Miranda warnings are not required.").
The first statement Jones made to the supervisor that he wanted to speak "to his mother, his attorney, and Detective Parker" was not made during interrogation. As the uncontroverted testimony reveals, Jones volunteered his statements to the supervisor, who had asked him no questions before he made this statement.
Even assuming the statements to the supervisor were made in the course of an interrogation, the statement made regarding his attorney was not an unequivocal request for counsel. As this Court explained in Owen, once there has been a knowing and voluntary waiver of the Miranda rights, as there was in this case earlier in the day when Jones provided the incorrect location of the body to Detective Parker, "law enforcement officers may continue questioning until and unless the suspect clearly [unequivocally] requests an attorney." Owen, 696 So.2d at 719 (quoting Davis v. United States, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). If the alleged statement is at best an "equivocal or ambiguous request," the questioning may continue. Owen, 696 So.2d at 719.
The trial court characterized Jones' spontaneous statement that he wanted "to talk to his mother, his attorney, and Detective Parker," as a statement made in passing. Based on our review of the record, we agree with the trial court's findings, especially considering that Jones kept "going on" after the statement and had repeatedly made clear that he wanted to speak with Parker and divulge the location of the body.
We agree that the statement was not an unequivocal request for counsel but was at most an equivocal statement regarding counsel. See Owen, 696 So.2d at 719. Taken in context, Jones' statement was not an expression of a desire to have his attorney present during questioning and deal with police only through counsel. See, e.g., Long v. State, 517 So.2d 664, 667 (Fla. 1987) ("I think I might need an attorney" was equivocal request for counsel), receded from on other grounds, Owen, 696 So.2d at 720; Waterhouse v. State, 429 So.2d 301, 305 (Fla.1983) (interrogation did not have to cease when accused stated "I think I want to talk to an attorney before I say anything else" because the defendant did not express a desire to deal with the police only through counsel), receded from on other grounds, Owen, 696 So.2d at 720.
We now turn to the exchange with Officer Vonk, which occurred after the supervisor asked Officer Vonk to watch over Jones while they waited for Parker to arrive. As to the issue of whether this exchange was an "interrogation" within the meaning of Miranda, it is clear that Jones initiated contact with Officer Vonk and volunteered his admission to the crime. However, it is also clear that some time during his encounter with Jones, Vonk asked whether and how he killed the victim.
In Christmas, we considered a somewhat similar factual scenario where a defendant initiated conversation with two court bailiffs, who we found to be law enforcement officers for purposes of Miranda. Although it was undisputed that one of the bailiffs asked the defendant who "did the shooting" in the case, whereupon the defendant made incriminating statements, we concluded that the strictures of

Miranda did not apply:

Miranda and its progeny require that Miranda warnings be given whenever custodial interrogation takes place. This is because of the coercive conditions *1021 that are inherent when suspects are questioned by "captors, who appear to control the suspect's fate, [and who] may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will." When, however, a defendant voluntarily initiates a conversation with law enforcement officers in which a defendant provides information about that defendant's case, Miranda warnings are not required. Although the bailiffs question was probably improper, under the circumstances we cannot say that Miranda warnings were required. Christmas voluntarily initiated the conversation at issue and the bailiffs question was not asked as the result of circumstances in which mutually reinforcing pressures were present so as to weaken Christmas's will.
Christmas, 632 So.2d at 1370-71 (alteration in original) (citations omitted).
Even if we were to conclude in this case that Jones was subjected to "interrogation" by Vonk, we would nonetheless conclude that Jones' statement to Vonk was not an unequivocal request for counsel that required cessation of any interrogation. See Owen, 696 So.2d at 719. Jones' statement that he wanted to speak with his attorney "to arrange to either [sic] for the attorney to see my mother or for me to see my mother" was not a request or indication that the interviews and questioning cease, or that Jones wished only to communicate through counsel. See Waterhouse, 429 So.2d at 305. In fact, the request appears directed more towards securing the company of his mother.
The record is clear throughout these exchanges with the supervisor and Officer Vonk that Jones repeatedly expressed his desire to confess his involvement in the crime, get the crime "off his chest," and "get right with God." He repeatedly volunteered his involvement in the crime and his desire to divulge the location of the victim's body. Under these circumstances, Edwards is not violated.
Finally, as to Jones' ultimate confession to Detective Parker when Parker arrived in response to Jones' request, it is uncontradicted that Jones approached Parker and told him he wanted to confess. Parker interrupted Jones and asked if he had been read and understood his rights. Jones said that he had and that he wanted to talk. Jones ultimately led Parker to the location of the body, where he executed a written waiver of his rights and specifically acknowledged that he had been administered his rights before being questioned by Parker. Thus, we conclude that the confession to Detective Parker was clearly admissible. Further, even if the two prior statements should not have been admitted, their admission would be rendered harmless by the proper admission of this final confession. See Davis v. State, 698 So.2d 1182, 1189 (Fla.1997).
Jones' argument that this confession should have been suppressed due to the preceding alleged requests for counsel is unavailing, considering, as we have explained, that neither of the preceding "requests" were unequivocal requests for counsel. Based on all the foregoing, we agree with the trial court that under the circumstances of this case there was no error in the admission of Jones' confessions. Accordingly, Jones is not entitled to relief on this point.
In his second point on appeal, Jones argues that he is entitled to a new trial because Detective Parker testified at trial that the first interrogation ended when Jones invoked his right to remain silent. The State concedes that this testimony was an improper comment on Jones' right to remain silent but maintains that the comment was harmless. We agree with the State's concession of error but also agree with the State that the error is harmless beyond a reasonable doubt.
In State v. DiGuilio, 491 So.2d 1129, 1137-38 (Fla.1986), we explained that improper comments on a defendant's invocation of his right to remain silent are subject to a harmless error analysis and need *1022 not require reversal if the Court is convinced, beyond a reasonable doubt, that the error did not contribute to the verdict. In this case, although the witness did improperly comment on the defendant's invocation of his right to silence, the remark was neither repeated nor emphasized. Further, the evidence against Jones included his confession to the crime, the fact that McRae was last seen alive with Jones before she disappeared, and the fact that Jones was arrested driving her vehicle with blood on his clothes and scratches on his face. The evidence also revealed that he attempted to use her ATM card and confidential ATM code over 100 times and was able to successfully withdraw over $600 between the time she was last seen alive and the time he was arrested just two days later. Considering this evidence and the fact that the error here was not repeated or emphasized, we are convinced "beyond a reasonable doubt that the that the error complained of did not contribute to the verdict." Id. at 1135. Accordingly, reversal is not required on this point.
In his third point on appeal, Jones argues that he is entitled to a new trial because the prosecution introduced irrelevant evidence suggesting that Jones harbored a racial prejudice against African-Americans. This alleged error arose in the context of Jones' first statement to police, where he denied his involvement in the murder, but attempted to explain the scratches on his face as resulting from a fight with two black males. Jones referred to the two men using a racial slur. The defense moved in limine to prevent Parker from repeating the racial slur when relating Jones' statement to the jury, arguing that it was not relevant and highly inflammatory. The trial court denied the motion, but informed the prosecutor that the witness could use the racial slur only once during his testimony. When Detective Parker testified, he did not actually use the racial slur, but made clear when quoting the defendant's statement that the defendant was "was talking about black guys," and "used a racial slur."
In arguing that this testimony constituted reversible error, Jones relies on Robinson v. State, 520 So.2d 1 (Fla.1988), and McBride v. State, 338 So.2d 567 (Fla. 1st DCA 1976). Both cases are distinguishable. In McBride, the First District reversed and granted a judgment of acquittal based on insufficient evidence. The court went on, however, to condemn the conduct of the prosecutor who elicited testimony of the specific racial obscenity uttered by the defendant:
Such alleged statement had no relevance to the case being tried but was undoubtedly offensive to two members of the jury who were of the black race. The effect of this remark attributed to appellant was to prejudice her in the eyes of the juryparticularly the two black members.
McBride, 338 So.2d at 568. The First District found that the trial court abused its discretion in refusing to deny a motion for mistrial not only as to this irrelevant prejudicial testimony, but also because the prosecutor introduced improper speculation regarding the defendant's prior criminal activities. See id. at 568-69.
In Robinson, the prosecutor elicited testimony during the penalty phase of the black defendant's trial suggesting that the defendant had a hostility towards white women and had committed previous sexual assaults on white women. 520 So.2d at 6. The murder victim in that case was a white woman. See id. We concluded in Robinson that the prosecutor's questioning of the expert was an attempt to insinuate that the defendant had a habit of preying on white women and "thus constituted an impermissible appeal to bias and prejudice." Id. We held that a new penalty proceeding was required under the circumstances. We emphasized that this irrelevant testimony was especially troublesome in the penalty phase of a capital case where the crime involved was interracial and the jurors were asked to make the *1023 subjective recommendation as to whether the death penalty should be imposed. See id. at 7-8.
The State relies on this Court's decision in Phillips v. State, 476 So.2d 194, 196 (Fla.1985), receded from on other grounds, Rogers v. State, 511 So.2d 526, 533 (Fla. 1987). In Phillips, the defendant argued that the testimony of a fellow inmate that the defendant used racial slurs when referring to the victim and the victim's family deprived him of a fair trial. 476 So.2d at 196. After first finding that any alleged error had not been preserved for review, we went on to conclude that "[e]ven if preserved for review, this testimony was relevant to discredit appellant's alibi and to explain the context of an incriminating admission; consequently, its admission at trial was not error." Id.; see also Robinson v. State, 574 So.2d 108, 113 (Fla.1991) (rejecting as "meritless" the black defendant's argument that his statement to police about shooting a "white woman" should have been edited to avoid the risk of racial prejudice).
In this case the jury was informed that Jones used a racial slur when he first gave his version of events to explain the scratches on his face in an attempt to deny his involvement in the murder. The detective did not repeat the racial slur but only indicated that a racial slur was used. Therefore, in this case we do not agree that the comments constituted impermissible appeals to the biases or prejudices of the jurors.
Although we strongly caution prosecutors against eliciting testimony involving racial slurs unless absolutely necessary, we understand that there are limited circumstances where the use of such offensive terms may be directly material to the issues in the case or to the testimony being offered. In this case, although we agree that it was necessary to tell the jury of Jones' initial explanation concerning the source of the scratch marks, we question whether it was necessary for Detective Parker to mention that a racial slur was used by Jones. In circumstances such as this, we strongly suggest that prosecutors err on the side of caution by omitting these statements and that trial courts consider the danger that the prejudicial effect of such evidence will substantially outweigh any probative value. See § 90.403, Fla. Stat. (1995).
However, in this case, we do not find that there was any attempt to inject race as an issue in the trial, or an impermissible appeal to bias and prejudice. We further note that Jones was a white male charged with murdering a white female. In addition, the actual racial slur was not used before the jury and the comment was not repeated or subsequently highlighted. Based on the foregoing, we find that even if the admission of this reference to Jones using a racial slur was error, it was harmless beyond a reasonable doubt. See Di-Guilio, 491 So.2d at 1135.
Defendant also argues in this point on appeal that the prosecutor elicited improperly prejudicial testimony that the defendant had a spider web tattoo on his elbow, allegedly associated with white supremacist gang activity. The only evidence regarding the tattoo during the trial was elicited from the owners and operators of the auto detailing business who were solicited by Jones to detail the interior of McRae's vehicle the day after the murder. These witnesses testified that they noticed Jones' distinctive spider web tattoo at the time they encountered him, and Jones was asked to display this tattoo for the jury.
There was no suggestion ever made to the jury by the State that the spider web tattoo was linked to racism, and it was only referred to before the jury as a distinctive characteristic assisting the witnesses in identifying the defendant. Accordingly, we find no error in the admission of this testimony.
In his fourth point on appeal, Jones alleges that the evidence was insufficient to establish premeditated murder and that the trial court therefore erred in *1024 submitting the murder charge to the jury on this theory. We find this point to be without merit.
The grand jury empaneled in this case indicted Jones for first-degree murder on the alternate theories of (1) premeditation and (2) felony murder during the course of a robbery or a kidnapping. The jury was charged on both theories. The jury returned a general verdict of guilty of first-degree murder.
We have previously held that even if the evidence does not support premeditated murder, any error in charging the jury on that theory is harmless where the evidence supports a conviction for felony murder, which has also been charged. See Mungin v. State, 689 So.2d 1026, 1029-30 (Fla. 1995), cert. denied, 522 U.S. 833, 118 S.Ct. 102, 139 L.Ed.2d 57 (1997). Even assuming that the evidence was not sufficient to support premeditated murder, the evidence is certainly sufficient to support the finding that the defendant committed the murder while engaged in the commission of a robbery and kidnapping. Jones is not entitled to reversal on this point.

III. PENALTY PHASE ISSUES
In his fifth point on appeal, Jones maintains that the trial court committed reversible error in excluding the testimony of Dr. Harold Eaton, who intended to testify regarding the negative effects of crack cocaine addiction. It is well settled that a trial court has broad discretion concerning the admission of expert testimony, and a trial court's ruling on that issue "will not be disturbed on appeal absent a clear showing of error." Hall v. State, 568 So.2d 882, 884 (Fla. 1990).
According to Jones' counsel's representations to the trial court, he deposed Dr. Eaton and intended to call him at trial, but learned just prior to trial that he was reluctant to testify for job-related reasonsEaton's supervisors at the hospital where he worked did not want him to testify. Dr. Eaton was not under subpoena because he had voluntarily agreed to testify. Upon first learning that there might be a problem, defense counsel requested that the State agree that Eaton's deposition could be admitted in lieu of his testimony. The State would not agree to the use of the deposition. The trial court itself offered to subpoena the witness, but defense counsel declined and informed the court that he would try to work out the problem of Eaton's availability himself.
Later, during the penalty phase of the trial, defense counsel proposed that the witness testify by telephone and withhold his last name and place of employment to protect his job concerns. Although Dr. Eaton had experience as a medical professional, the defense intended to call him only "because he has experience as a crack addict." As the trial court summarized it, all the witness would testify about was "the fact that he was addicted or once addicted and how it affected him." The trial court ruled that the witness could not testify because "he's not testifying to anything except his personal problems and he's not giving an expert opinion as to how it relates to this defendant."
According to Eaton's deposition, presented as a proffer, he is a psychiatrist, not board certified, who has had specialized training in drug addiction and drug treatment programs. Importantly, however, the vast majority of his testimony related only to his experiences as a drug addict. There were only a few references to the symptoms of crack addicts in general. As he characterized the purpose of his testimony, "I have been asked to testify as a person who has been through the experience of crack cocaine." Eaton admitted that he had not examined the defendant, had never interviewed him, and had not been asked to review materials in order to make a clinical assessment of him.
Defendant maintains that Eaton's testimony should have been admitted as expert testimony, even though he had no personal knowledge of the defendant's *1025 circumstances. We agree with Jones' general assertion that a defendant may offer an expert witness to testify to the nature of a particular subject of expertise. See Charles W. Ehrhardt, Florida Evidence § 702.1, at 548 (1999 ed.); see also State v. Hickson, 630 So.2d 172 (Fla.1993). However, before expert testimony is admitted the trial court must make the following determinations: "First, the subject must be beyond the common understanding of the average layman. Second, the witness must have such knowledge as `will probably aid the trier of facts in its search for truth.'" Huff v. State, 495 So.2d 145, 148 (Fla.1986) (quoting Buchman v. Seaboard Coast Line R.R., 381 So.2d 229, 230 (Fla. 1980)).
Jones analogizes this case to Hickson, wherein this Court held that experts on battered-spouse syndrome are permitted to testify to explain the characteristics of battered women, which are beyond the understanding of the average juror, even though the questions are based only on hypothetical facts and are not specifically related to the facts of the defendant's case. 630 So.2d at 176. However, there is an important distinction in this case. In his proffer, Eaton provided little generalized expert testimony regarding the effects of crack cocaine, but instead primarily related his personal experiences with the drug as a drug addict.
Unlike the testimony in Hickson, Eaton made no real attempt to testify to the generalized characteristics of crack cocaine addiction. His own personal experiences would not be relevant to any of the penalty phase issues. See Huff, 495 So.2d at 147-48 (finding no abuse of discretion in trial court's exclusion of testimony that "would have been a general critique of proper police practice in processing crime scenes," even though the processing and contamination of the crime scene was an "integral part of appellant's defense").
Moreover, Eaton's testimony was not even expert testimony because the substance of his testimony related to his own personal experiences. See Huff, 495 So.2d at 147-48. Based on all of these factors, we conclude that the trial court did not abuse its broad discretion in refusing to allow this testimony, especially in light of the fact that the defense had suggested that the expert testify via telephone, without even providing his last name or place of employment.
Further, Eaton's testimony would also have been cumulative to other evidence heard by the jury. The jury heard the testimony of Jones' wife regarding the strength of Jones' compulsion for crack and the drastic effect it had on his ability to do anything but endeavor to secure more. In addition, another penalty phase expert witness testified to the addictive effect of cocaine on addicts, their compulsion to attain more crack no matter the cost, and its effect on their ability to control their behavior. Further, there was no assertion that Jones was high on crack at the time of the murder. Finally, the trial court did find as a mitigating circumstance that Jones was a crack addict, that the felony was committed while Jones was under the influence of extreme mental or emotional disturbance, and that Jones' addiction to cocaine substantially impaired his ability to conform his behavior to the requirements of the law. The trial court gave all these mitigators some weight. Thus, even if we were to conclude that this testimony was improperly excluded, the exclusion would be harmless beyond a reasonable doubt. Based on the foregoing, Jones is not entitled to relief on this claim.
In his sixth point on appeal, Jones argues that he is entitled to a new penalty phase proceeding because the trial court improperly allowed the details of Jones' prior murder of Jasper Highsmith in 1986 to become a feature of the penalty phase proceedings. We disagree.
In this case the State was permitted to present Jones' confession to Highsmith's murder through the testimony of Detective Bradley, a coroner's report indicating that *1026 Highsmith's death was caused by trauma to the head and a stab wound to the chest, and photographs of the crime scene, including photographs of Highsmith's body as it was found. The defendant objected that the introduction of this testimony made the prior murder an impermissible, inflammatory feature of the penalty-phase proceedings.
In Rhodes v. State, 547 So.2d 1201, 1204-05 (Fla.1989), this Court enunciated the principles governing the admission of prior violent felonies in penalty phase proceedings:
[I]t is appropriate in the penalty phase of a capital trial to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of conviction. Testimony concerning the events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence.
. . . .
... [However,] the line must be drawn when that testimony is not relevant, gives rise to a violation of a defendant's confrontation rights, or the prejudicial value outweighs the probative value.

Id. (citations omitted) (emphasis supplied). In Waterhouse v. State, 596 So.2d 1008, 1016 (Fla.1992), we found no error in the admission of hearsay testimony from the investigating officer regarding the defendant's prior crime, while in Duncan v. State, 619 So.2d 279, 282 (Fla.1993), we held that a "gruesome" photograph depicting "gaping wounds to the prior victim's head and face" should not have been admitted because the prejudicial effect of the photograph outweighed its probative value.
As to the recitation by police of Jones' confessions to the Highsmith crime, we have previously held that a police officer may give hearsay testimony concerning a defendant's prior violent felonies. See Hudson v. State, 708 So.2d 256, 261 (Fla.1998); Clark v. State, 613 So.2d 412, 415 (Fla.1992); Waterhouse, 596 So.2d at 1016. This is especially true where, as here, the statements recited include the defendant's own confession to the crime. Regarding the admission of the details of the cause of Highsmith's death, including photographs of the body and the coroner's report, we conclude that this evidence was relevant and admissible to "assist[] the jury in evaluating the character of the defendant and the circumstances of the crime." Rhodes, 547 So.2d at 1204. In this case the limited evidence of the previous murder was probative. It was not unduly focused upon in the proceeding, or made a feature of the trial. See Hudson, 708 So.2d at 261; Duncan, 619 So.2d at 282; Rhodes, 547 So.2d at 1205. Accordingly, we conclude that Jones is not entitled to reversal on this point.
As to Jones' seventh point on appeal, we conclude that the trial court did not abuse its discretion in refusing to allow Jones' prior counsel to testify regarding the contents of a competency evaluation performed on Jones in 1986 in a prior proceeding, where a proper predicate had not been laid for the evaluation's admission, and the evaluation required the interpretation of an expert. See Johnson v. State, 660 So.2d 637, 645 (Fla.1995). Moreover, Jones' competency to proceed in 1986 is irrelevant in light of the fact that he was later declared competent to proceed in that case, and there was no finding that he was incompetent to proceed in this case. Even if the trial court erred, the error would be harmless as to the penalty phase in light of the aggravating circumstances in this case, the testimony in mitigation regarding Jones' drug abuse, the trial court's recognition of the mitigating factor that Jones' capacity to appreciate the criminality of his conduct was impaired, and the fact that the presentence investigation report considered by the trial *1027 court before imposing sentence contained similar information. See Downs v. State, 572 So.2d 895, 900 (Fla.1990).
In his eighth point on appeal, Jones maintains that the evidence was insufficient to support the finding that the murder was committed to avoid arrest. We have previously held that when the victim is not a law enforcement officer, the evidence must demonstrate "beyond a reasonable doubt that the victim was murdered solely or predominantly for the purpose of witness elimination." Knight v. State, 721 So.2d 287, 298 (Fla.1998) (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)). The aggravator can be based on circumstantial evidence. See Preston v. State, 607 So.2d 404, 409 (Fla.1992); see also, e.g., Urbin, 714 So.2d at 416; Consalvo v. State, 697 So.2d 805, 819 (Fla.1996), cert. denied, 523 U.S. 1109, 118 S.Ct. 1681, 140 L.Ed.2d 819 (1998).
In regard to the avoid arrest aggravator, the trial court found in its sentencing order:
This aggravating circumstance requires clear proof that the Defendant's dominate motive was the elimination of a witness. Although it is clear that this aggravator was proven be [sic] circumstantial evidence, the facts are clear that the Defendant selected Lori McRae as victim in order to rob her and obtain money to purchase crack cocaine.... However, there was not reason for the Defendant to kill the victim after he had obtained her money to buy crack cocaine. The Defendant had abducted the victim from the parking lot in Duval County and had used the victim's ATM card approximately two hours later in Nassau County, where he extracted $300 from the ATM machine. He could not have used this card any other way than obtaining the PIN number from the victim. Once the money had been obtained from the machine the Defendant had no reason to kill the victim, yet he transported her to Baker County where her body was left in a wooded area.... By transporting Lori McRae to the remote location in Baker County where he killed her, the only reasonable inference that the Court can glean from the evidence was that he intended to eliminate her as a witness to crime. The Court finds that this aggravator was proven beyond a reasonable doubt.
We find that competent substantial evidence supports the trial court's findings of fact, and although the evidence could "be contested," we agree that the circumstantial evidence in this case supports the avoid arrest aggravator. Knight, 721 So.2d at 298. It is well accepted in this Court that the avoid arrest aggravator is proper where "the victim is transported to another location and then killed." See Hall v. State, 614 So.2d 473, 477 (Fla.1993), and cases cited therein. McRae's body was found in a wooded area of a neighboring county, and the evidence tended to prove that she died as a result of ligature strangulation. As recognized by the trial court, based on the evidence in this case, there was no reason to kill the victim except to prevent detection and arrest. See, e.g., Jennings, 718 So.2d at 151; Willacy v. State, 696 So.2d 693, 696 (Fla.), cert. denied, 522 U.S. 970, 118 S.Ct. 419, 139 L.Ed.2d 321 (1997); Thompson v. State, 648 So.2d 692, 695 (Fla.1994).
Further, any error on this point would be harmless. The other aggravating circumstances found by the trial court, which indisputably apply in this case, were: (1) murder during the commission of a kidnapping and robbery; (2) the commission of a prior violent felony (murder); and (3) the murder in this case was heinous, atrocious, or cruel. In the presence of three strong aggravators, including that Jones had previously been convicted of a prior murder, we are convinced beyond a reasonable doubt that even if the evidence did not support the avoid arrest aggravator, the trial court would have nonetheless imposed the death penalty. See Geralds v. State, 674 So.2d 96, 104-05 (Fla.1996).
*1028 We reject Jones' argument in his ninth point on appeal that a new penalty phase proceeding is required because the trial court allegedly abused its discretion in denying Jones' counsel's motion to withdraw. Defense counsel argued at the time that he should be permitted to withdraw because in a presentence investigation report prepared before the penalty phase proceedings Jones stated that he wanted to plead guilty and that it "was not [his] idea to put the family through [the trial]," but his attorney's. Defense counsel maintained that he could not introduce this report into evidence before the jury because it attacked trial counsel's strategy in the case and that he should be allowed to withdraw so that the report could be introduced. However, the presentence investigation report Jones' counsel claimed he was prevented from introducing contained a detailed description of Jones' lengthy criminal history, of which the jury was not otherwise aware, including numerous prior convictions for burglary and drug possession. It is difficult to understand how the presentence investigation report would have further assisted counsel in presenting the mitigating evidence in this case. Moreover, the report was considered by the trial court in rendering its decision on the imposition of death. Accordingly, we find no abuse of discretion in the trial court's denial of Jones' motion to withdraw.
Finally, we decline to reverse the death sentence based on any errors alleged in issue (10), regarding the victim impact evidence, issue (11), regarding the HAC instruction, issue (12), regarding the "felonymurder aggravator" and issue (13), regarding the constitutionality of the death penalty. These arguments have been resolved by this Court adversely to Jones' position in prior cases. See Bonifay v. State, 680 So.2d 413, 419-20 (Fla.1996), and Window, v. State, 656 So.2d 432, 439 (Fla.1995) (point (10)); Wike v. State, 698 So.2d 817, 821-22 (Fla.1997), cert. denied, 522 U.S. 1058, 118 S.Ct. 714, 139 L.Ed.2d 655 (1998), and Hall v. State, 614 So.2d 473, 478 (Fla.1993) (point (11)); Blanco v. State, 706 So.2d 7, 11 (Fla.1997), cert. denied, ___ U.S. ___, 119 S.Ct. 96, 142 L.Ed.2d 76 (1998) (point (12)); and Jones v. State, 701 So.2d 76, 80 (Fla.1997) (point (13)).

CONCLUSION
Based on the foregoing, the conviction and death sentence are hereby affirmed.
It is so ordered.
HARDING, C.J., SHAW, WELLS, ANSTEAD, PARIENTE and LEWIS, JJ., and OVERTON, Senior Justice, concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Jones' mother has had custody of Jones' son since shortly after the child's birth.
[3] (1) Whether his confessions introduced against him were obtained in violation of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); (2) whether the defendant is entitled to a new trial based on Detective Parker's testimony regarding Jones' invocation of his right to remain silent; (3) whether Detective Parker's reference to a racial slur used by the defendant during his statement to police and reference to a spider tattoo on his arm allegedly linked with unrelated racial killings require a new trial; (4) whether the evidence was sufficient to establish premeditated murder; (5) whether the trial court committed reversible error in refusing to allow the testimony, during the penalty phase, of a witness who would testify about the impact of crack cocaine; (6) whether the admission of details and photographs regarding the defendant's prior murder conviction requires a new penalty-phase proceeding; (7) whether the trial court's refusal to allow the defendant's prior counsel to testify regarding a psychiatric report prepared in 1986 finding the defendant incompetent requires a new trial; (8) whether the evidence supports the avoid arrest aggravator; (9) whether the trial court erred in denying Jones' counsel's motion to withdraw prior to the penalty phase proceeding; (10) whether the trial court erred in allowing the State to introduce victim impact evidence; (11) whether a new penalty phase is required for the trial court's substitution of "or" for "and" in the HAC instruction to the jury, and whether the HAC instruction is unconstitutional; (12) whether the trial court erred in instructing the jury that an aggravating circumstance could be based on the felony underlying the felony-murder conviction; and (13) whether the death penalty is unconstitutional.
[4] This rule is the same whether the right to counsel is invoked under either the Fifth or Sixth Amendment. See Michigan v. Jackson, 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986).