CANADY, J.,
dissenting.
The majority concludes that a thirty-seven minute recording of Michael Jackson’s custodial interrogation should have been excluded from evidence on the basis that its probative value was substantially outweighed by the danger of unfair prejudice and that the admission of this evidence was harmful error. I disagree. Given the DNA evidence linking Jackson to the victim and the implausibility of Jackson’s in-court explanation for the DNA evidence, there is no reasonable possibility that the recording contributed to the jury’s decision that Jackson murdered Andrea Boyer. Because any error in admitting the recording was harmless and the remaining issues raised on appeal are without merit, I dissent- from the majority’s decision to reverse Jackson’s convictions and remand for a new trial.
In the challenged recording, two detectives from the Clay County Sheriffs Office repeatedly expressed the opinion that Jackson had sexually battered and murdered Boyer, while Jackson continually insisted that he did not walk to work on the morning of January 23, 2007, did not recognize the photograph of Boyer, and did not kill anyone. The erroneous admission of evidence is subject to harmless error review. Fitzpatrick v. State, 900 So.2d 495, 516 (Fla.2005). “An error is harmless if ‘the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.’” Dennis v. State, 51 So.3d 456, 463 (Fla.2010) (quoting State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986)). “Application of the [harmless error] test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied.” DiGuilio, 491 So.2d at 1135. Here, the recorded statement — which did not contain any admission of guilt by Jackson — was inconsequential to the State’s case against Jackson, and the prejudicial portions of the recording were “neither repeated nor em *345 phasized” to the jury. Fitzpatrick, 900 So.2d at 517 (quoting Jones v. State, 748 So.2d 1012, 1022 (Fla.1999)).
The State’s case against Jackson relied primarily on evidence establishing that Jackson’s semen was discovered in the victim’s body. The medical examiner explained that when he arrived at the crime scene, there was a substance visibly pooling in the victim’s vagina and that before her body was moved from the scene, he collected vaginal and anal swabs. The lab analyst who examined these swabs testified that sperm was present on the swabs and that the DNA profile of the sperm matched Jackson’s known DNA profile. She further testified that while testing of the swabs produced DNA matching the victim and DNA matching Jackson, there was no evidence of a third DNA contributor to the sample. An expert in population genetics testified that the frequency of the DNA profile of the sperm on the swabs was approximately one in thirty-one quadrillion and thus, in his opinion, the sperm came from Jackson. And a detective who interviewed Jackson shortly after the murder testified — without objection — that when confronted with the DNA evidence and a photograph of Boyer, Jackson offered no explanation as to why his DNA would have been found on the victim’s body and did not indicate that he knew Boyer.
The State also relied on evidence of the early morning routines of both the victim and Jackson, which established that Jackson had the opportunity to commit the charged offenses. Boyer’s husband testified that the drive from their home to the veterinary clinic where Boyer worked would ordinarily take about twenty to thirty-five minutes and that Boyer generally stopped at either a certain Kangaroo convenience store or a certain Chevron station to buy cigarettes on the way. He further testified that on the morning of January 23, 2007, specifically, Boyer left her home between 4:30 a.m. and 4:45 a.m. A manager from the Kangaroo store confirmed that Boyer visited the store that morning. According to the store’s surveillance camera, Boyer entered at 5:10 a.m., purchased cigarettes and a soft drink, and exited at 5:12 a.m. without interacting with any other customers. In addition, the evidence showed that before deactivating the clinic’s alarm at 5:24 a.m., Boyer must have driven three-quarters of a mile from the convenience store to the clinic, exited her vehicle to unlock and open the gate to the clinic parking lot, reentered her vehicle and backed it into her usual parking spot, returned to close and lock the gate, and entered the main building of the clinic where the alarm keypad was located. The State presented testimony from Boyer’s coworkers that Boyer had completed only a few of her many morning tasks before her death, suggesting that Boyer must have been attacked shortly after deactivating the alarm at 5:24 a.m.
Other witnesses established that Jackson was likely near the clinic early on the morning of January 23, 2007. A law enforcement officer testified that the distance from Jackson’s home in a motel to the clinic was one-half of a mile, and several witnesses, who were familiar with the location of Jackson’s home and the construction company for which he worked, testified that the only feasible way to walk from the motel to the construction company’s office was to walk along Wells Road and to pass the clinic. A few witnesses testified that they, had, in fact, on occasion seen Jackson walking that route. The Kangaroo store manager added that while Jackson was a regular morning customer at her store, she did not see him on the morning of January 23, 2007. And a coworker who testified that he drove Jackson to work on six or seven occasions stated *346 that he did not begin to pick Jackson up from the motel until after January 23, 2007. That coworker further added that while Jackson had worn a white windbreaker prior to January 23, 2007, he never saw Jackson wear that jacket after January 23, 2007.
Jackson, in turn, offered an exculpatory explanation for the DNA evidence. Jackson testified that he first met Boyer at a strip club where she had danced and then later realized that she was a regular morning customer at the same Kangaroo store he frequented. Jackson explained that after they exchanged pleasantries in the convenience store, they eventually began to meet to do illegal drugs and have sex. He estimated that he and Boyer interacted on about fifty or sixty occasions. Specifically, regarding the morning of January 23, 2007, Jackson testified that between 4:30 a.m. when he woke and approximately 6 a.m. when he arrived at work, he left the motel where he lived, walked to a Chevron station where Boyer picked him up, went with her to a nearby parking lot where they had consensual sex and smoked marijuana together, and then walked the remaining distance to his workplace. Jackson testified that after they had sex and smoked together, Boyer drove away, presumably to her workplace.
In closing argument, the prosecuting attorneys focused on Boyer’s injuries and the DNA evidence implicating Jackson but also argued to the jury that Jackson’s statements in the recording contradicted many aspects of his trial testimony and thus showed him to be not credible. The prosecutors did not, however, at any point refer to the opinions expressed by the detectives. Thus, while the recording was mentioned in closing, the prosecutors did not draw attention to any unfairly prejudicial aspects of the recording.
When the above evidence and argument are considered as a whole, the recording could not have affected the jury’s verdict because — independent of what Jackson did or did not admit to the law enforcement officers — Jackson’s in-trial account of the events of January 23, 2007, is patently unbelievable.
To accept as true Jackson’s claim that he had consensual sex and smoked marijuana with Boyer that morning, the jury would have to believe either that Boyer’s husband inaccurately reported what time she left in the morning or that the encounter between Jackson and Boyer occurred between 4:50 a.m. and 5:10 a.m. or 5:12 a.m. and 5:24 a.m. A rendezvous between Jackson and Boyer during the latter period is particularly implausible given that after leaving the Kangaroo store, Boyer drove to the clinic, unlocked and opened the clinic gate, parked, and closed and relocked the gate before deactivating the alarm at 5:24 a.m. The jury would also have to believe that Boyer stopped at the Chevron station to pick up Jackson but nevertheless that same morning went to a different convenience store to purchase cigarettes and a drink.
Even if the jury accepted Jackson’s testimony that he had consensual sex with Boyer on the morning of January 23, 2007, Jackson’s claim that he did not kill Boyer remains incredible. As the majority concedes, to conclude he was innocent of murder the jury would have to believe that Jackson and Boyer “engaged in consensual sex without a prophylactic, quickly parted ways, and then another unidentified individual brutally attacked, raped, and murdered her without leaving behind any discernible DNA evidence such as semen, or displacing Jackson’s semen” or that “another unidentified individual ... brutally murdered Boyer, wrapped her scrubs and underwear around one ankle, and lifted *347 her shirt above her bra to make it look like a rape had occurred,” again without displacing Jackson’s semen. Majority op. at 343.
On this record, the admission of the recorded -interrogation was harmless beyond a reasonable doubt. Furthermore, Jackson’s additional claims on appeal are without merit.
First, Jackson contends that because the State failed to prove that the sexual encounter between Jackson and the victim was nonconsensual, the trial court erred in denying Jackson’s motion for a judgment of acquittal on the charge of sexual battery and in finding and giving great weight to the aggravating factor that the capital felony was committed during the commission of a sexual battery. This argument is without merit. “[W]hen there is an inconsistency between the defendant’s theory of innocence and the evidence, ... the question is one for the finder of fact to resolve and the motion for judgment of acquittal must be denied.” Durousseau v. State, 55 So.3d 543, 557 (Fla.2010), cert. denied, - U.S. -, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011). As discussed above, Jackson’s claim that he had sexual intercourse with the victim before she arrived at the clinic on January 23, 2007, cannot be reconciled with the State’s presentation regarding the ■victim’s activities that morning. In addition, the medical examiner testified that the victim had bruises on her shoulder that were consistent with being pressed to the floor, bruises on her inner thighs that were consistent with someone forcing her legs apart, and several bruises on her arms that were consistent with being forcefully grabbed. In light of this evidence contradicting Jackson’s theory of innocence, the trial court did not err in submitting the sexual battery charge to the jury. It also follows that because the above competent, substantial evidence supports the finding of a sexual battery, the trial court did not err in finding the murder was committed during a sexual battery aggravating factor. See Frances v. State, 970 So.2d 806, 815 (Fla.2007) (“[Tjthe Court’s function is ‘to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent, substantial evidence supports its finding.’ ” (quoting Willacy v. State, 696 So.2d 693 (Fla.1997))). As for his final argument regarding the sexual battery, Jackson has not established that — given the above evidence — no reasonable judge would have assigned great weight to the aggravating factor. See Merck v. State, 975 So.2d 1054, 1065 (Fla.2007) (“[W]e do not reweigh the aggravating and mitigating factors. We defer to the trial court’s determination ‘unless no reasonable person would have assigned the weight the trial court did.’ ” (quoting Rodgers v. State, 948 So.2d 655, 669 (Fla.2006))).
Second, Jackson asserts on appeal that because the State did not prove the existence of a nexus' between the murder and his status as a probationer, the felony probation aggravating factor was improperly applied. This Court has previously rejected the claim that the felony probation aggravating factor must include a nexus requirement in order to sufficiently narrow the class of persons eligible for the death penalty, see Caylor v. State, 78 So.3d 482, 496 (Fla.), cert. denied, - U.S. -, 132 S.Ct. 2405, 182 L.Ed.2d 1042 (2012), and Jackson has not presented any fact unique to his case which requires reconsideration of this issue.
Third, the trial court did not err by denying Jackson’s request to instruct the jury that he faced a life sentence if the jury convicted him of sexual battery. This Court has previously “held that, during the penalty phase, there is no need to instruct the -jury on the penalties for noncapital *348 crimes.” Gorby v. State, 630 So.2d 544, 548 (Fla.1993) (citing Nixon v. State, 572 So.2d 1336, 1345 (Fla.1990)).
Fourth, Jackson’s death sentence is not unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). “Ring does not apply to cases where the prior violent felony, the prior capital felony, or the under-sentence-of-imprisonment aggravating factor is applicable.” Hodges v. State, 55 So.3d 515, 540 (Fla.2010), cert. denied, - U.S. -, 132 S.Ct. 164, 181 L.Ed.2d 77 (2011).
Finally, for reasons evident in the facts set forth in the majority opinion and in this dissent, I would conclude that the evidence is sufficient to support the first-degree murder conviction and that the sentence of death is proportionate.
Based on the foregoing, I would affirm the convictions and death sentence.
POLSTON, C.J., concurs.